William Neal MOORE,
Petitioner–Appellant,

v.

Walter ZANT, Respondent–Appellee.

No. 84–8423.

United States Court of Appeals,
Eleventh Circuit.

Sept. 28, 1989.

Rehearing Denied Nov. 3, 1989.

---

John Charles Boger, New York City, G. Terry Jackson, Savannah, Ga., Daniel J. Givelber, Boston, Mass., for petitioner-appellant.

Susan V. Boleyn, Asst. Atty. Gen., Atlanta, Ga., for respondent-appellee.

Before RONEY, Chief Judge, TJOFLAT, HILL, FAY, VANCE, KRAVITCH, JOHNSON, HATCHETT, ANDERSON, CLARK, EDMONDSON and COX, Circuit Judges.

COX, Circuit Judge:

This case originated in this court as an appeal from a federal district court's dismissal of petitioner Moore's second application for federal habeas corpus relief as an abuse of the writ within the meaning of Rule 9(b) of the Rules Governing 28 U.S.C. § 2254 cases. This court, sitting *en banc*, ultimately reversed in part the district court's finding of abuse, and remanded the case in part. *Moore v. Kemp*, 824 F.2d 847 (11th Cir.1987). Subsequently, the State filed a petition for a writ of certiorari with the Supreme Court. Following oral argument, this court's *en banc* opinion was vacated and the case was remanded "for further consideration in light of *Teague v. Lane*, 489 U.S. ——, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989)." *Zant v. Moore*, 489 U.S. ——, 109 S.Ct. 1518, 103 L.Ed.2d 922 (1989). We affirm the district court's decision.

I.

A. *Procedural History*

Petitioner, William Neal Moore, murdered Fredger Stapleton in Stapleton's home during the course of an armed robbery on April 2, 1974.[1] Moore was indicted on May 13, 1974, by a grand jury in Jefferson County, Georgia, for the murder and robbery of Stapleton. On June 4, 1974,

---

1. The facts of this case have been recounted elsewhere. *See, e.g., Blake v. Zant*, 513 F.Supp. 772, 803–04 (S.D.Ga.1981), *aff'd in part and rev'd in part sub nom. Moore v. Balkcom*, 716 F.2d 1511 (11th Cir.1983), *cert. denied*, 465 U.S. 1084, 104 S.Ct. 1456, 79 L.Ed.2d 773 (1984); *Moore v. State*, 233 Ga. 861, 213 S.E.2d 829, 830–31 (1975), *cert. denied*, 428 U.S. 910, 96 S.Ct. 3222, 49 L.Ed.2d 1218 (1976).

Moore was arraigned in the Superior Court of Jefferson County, waived a trial by jury with respect to both charges, and pled guilty to the charges. Because the State sought the death penalty on the malice murder charge, Moore was entitled, under Georgia law, to have a jury determine whether that penalty, or a sentence of life imprisonment, should be imposed. Moore waived his right to a jury determination, electing, instead, to be sentenced by the court.

On July 17, 1974, the court conducted a bench trial on the penalty issue. After considering the evidence adduced by the prosecution and the defense, including a presentence investigation report which had been prepared by the court's probation officer and introduced into evidence by the prosecutor without objection, the court found that Moore had committed the Stapleton murder during the course of an armed robbery, an aggravating circumstance that rendered Moore subject to the death penalty. *See* Ga.Code Ann. § 27–2534.1(b)(2) (Harrison 1978) (current version at Ga.Code Ann. § 17–10–30(b)(1) (1982)). Thereafter, the court sentenced Moore to death.

Moore's conviction and sentence were affirmed by the Supreme Court of Georgia on direct appeal. *Moore v. State*, 233 Ga. 861, 213 S.E.2d 829 (1975) (per curiam), and the Supreme Court subsequently denied Moore's petition for a writ of certiorari. *Moore v. Georgia*, 428 U.S. 910, 96 S.Ct. 3222, 49 L.Ed.2d 1218 (1976). Following the denial of certiorari, Moore petitioned the Superior Court of Jefferson County for a new sentencing proceeding. The court denied his motion, and the Supreme Court of Georgia affirmed. *See Moore v. State*, 239 Ga. 67, 235 S.E.2d 519 (1977). A petition for a writ of certiorari was denied by the Supreme Court in *Moore v. Georgia*, 434 U.S. 878, 98 S.Ct. 232, 54 L.Ed.2d 159 (1977).

After exhausting all avenues for direct review of his conviction and sentence, Moore initiated collateral proceedings for relief. In early 1978, Moore petitioned the Superior Court of Tattnall County, Georgia, for a writ of habeas corpus, presenting six grounds for relief. Relevant to this appeal was the inclusion of a claim based upon an alleged violation of *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977)—that neither Moore nor his attorney was afforded adequate opportunity to review the presentence investigation report prior to the sentencing proceeding. Following an evidentiary hearing, the court rejected his petition, including his *Gardner* claim, and the Supreme Court of Georgia refused to grant him a certificate of probable cause to appeal.

In November 1978, Moore, represented by James C. Bonner, Jr., filed his first federal petition for a writ of habeas corpus in the United States District Court for the Southern District of Georgia, asserting four of the six claims he had presented in his state habeas petition; one of the claims omitted was his *Gardner* claim. On March 6, 1979, while the petition was pending in the district court, Moore filed a *pro se* motion to amend his petition to add an ineffective assistance of trial counsel claim.

Thereafter, Bonner, who had represented Moore during the state habeas proceedings, requested and received leave to withdraw as counsel, and the district court appointed H. Diana Hicks as substitute counsel. Hicks immediately moved for leave to amend Moore's petition to present his *Gardner* claim. In April 1981, the district court denied both the *pro se* and Hicks motions for leave to amend, *see Blake v. Zant*, 513 F.Supp. 772, 804–06 (S.D.Ga. 1981), granted the writ as to Moore's sentence on the basis that "the penalty of death is cruel and unusual as applied to him in light of the circumstances of the crime and other relevant factors," *id.* at 803, and denied relief on all of Moore's remaining claims.

The State appealed the district court's judgment granting the writ as to Moore's sentence; Moore cross-appealed, challenging the district court's rulings on the claims that the district court had rejected and the court's refusal to allow him to amend his petition. A panel of this court reversed the district court's grant of relief and affirmed the court's rejection of his remaining challenges to his guilty pleas and death sentence. *Moore v. Balkcom*, 716 F.2d 1511, 1518–19, 1527 (11th Cir.1983) (on rehear-

ing). The panel also concluded that the district court did not abuse its discretion in refusing to grant Moore leave to amend his petition. *Id.* The Supreme Court subsequently denied Moore's petition for a writ of certiorari. *Moore v. Balkcom*, 465 U.S. 1084, 104 S.Ct. 1456, 79 L.Ed.2d 773 (1984).

Moore thereafter returned to state court for relief, seeking a writ of habeas corpus from the Superior Court of Butts County, Georgia, on the following grounds: (1) the State violated Moore's Fifth, Sixth, and Fourteenth amendment rights when it failed to advise Moore of his right to remain silent and of his right to counsel prior to or during a presentence interview that was conducted by a probation officer after conviction and before sentencing (a claim based on *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981)); (2) the State denied Moore the right to confront and cross-examine witnesses whose hearsay testimony was contained in the presentence investigation report (a claim based on *Proffitt v. Wainwright*, 685 F.2d 1227 (11th Cir.1982), *modified*, 706 F.2d 311 (11th Cir.), *cert. denied*, 464 U.S. 1002, 104 S.Ct. 508, 78 L.Ed.2d 697 (1983)); (3) Moore received ineffective assistance of trial counsel at the sentencing phase of his case; and (4) the death penalty in Georgia was being administered in a racially discriminatory manner.[2] The superior court rejected each of these claims without an evidentiary hearing. The court concluded that the ineffective assistance of counsel claim had been litigated fully in Moore's first state habeas proceeding and Moore had offered no reason why it should be relitigated, and Moore had waived his remaining claims by failing to raise them during that initial state proceeding. *See* Ga.Code Ann. § 9–14–51 (1982). In March 1984, the Supreme Court of Georgia denied Moore's application for a certificate of probable cause to appeal.

Moore then filed his second federal habeas petition, presenting the seven claims he had asserted in his second state habeas petition. Moore alleged that the claims were based on either newly discovered facts (the racially discriminatory application of the death penalty claim) or novel legal principles (all remaining claims) that were not "reasonably available" when he filed his first federal habeas petition. Moore also presented his *Gardner* claim, which he had attempted to raise in his first federal proceeding in a motion for leave to amend his petition and which he had failed to raise in his second state habeas petition.

In May 1984, the district court dismissed Moore's petition and denied a certificate of probable cause to appeal. With respect to all except one of the claims presented,[3] the court concluded that the delayed presentation of Moore's claims constituted an abuse of the writ under Rule 9(b) of the Rules Governing 28 U.S.C. § 2254 Cases; the court found that the claims were based neither on newly discovered facts nor on newly established constitutional principles, and that Moore offered no lawful reason why he should not have asserted them in his previous petition. Adopting the district court's opinion in full, a divided panel of this court affirmed the decision. *Moore v. Zant*, 734 F.2d 585 (11th Cir.1984) (per curiam).

On Moore's petition for rehearing, this court, sitting *en banc*, considered whether Moore's failure to present in his first federal habeas petition five of the claims presented in the second habeas petition— the *Estelle, Proffitt,* and *Gardner* claims, the claim that the death penalty was applied in a racially discriminatory manner, and the ineffective assistance of counsel claim—constituted an abuse of the writ justifying summary dismissal.[4] A majority of the court was of the opinion that Moore did

---

**2.** Moore raised three additional claims, none of which is relevant on this appeal.

**3.** In his second state and federal habeas petitions, Moore asserted that he was sentenced to death in violation of *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), because he lacked the specific intent to kill his victim. Observing that it had rejected the *Enmund* claim on the merits in Moore's previous

federal habeas proceeding, the district court held that the claim was meritless and that the ends of justice did not require its relitigation.

**4.** In his *en banc* brief and during oral argument before this court, Moore addressed only five of the claims that were presented in his second federal petition. We deem those claims not advanced on appeal abandoned. *E.g., Roberts v. Wainwright*, 666 F.2d 517, 518 (11th Cir.1982).

not abuse the writ by failing to assert his *Estelle* and *Proffitt* claims in his first federal habeas petition since he did not intentionally withhold those claims, and neither he nor his counsel reasonably could have anticipated the decisions on which those claims were based. *Moore v. Kemp,* 824 F.2d 847, 850–54 (11th Cir.1987) (7–5 decision). The majority also concluded that the district court, on remand, should "give fresh consideration to whether the ends of justice require it to consider the merits of Moore's *Gardner* claim." *Id.* at 857. Finally, the court unanimously affirmed the district court's dismissal of the two remaining claims as an abuse of the writ. *Id.* at 857, 858, 877.

The State subsequently sought Supreme Court review of this court's *en banc* decision. Certiorari was granted to consider two questions presented by the State, each of which relates to the abuse of the writ doctrine.[5] Instead of addressing the questions presented by the State, the Supreme Court vacated this court's judgment and remanded the case "for further consideration in light of *Teague v. Lane,* 489 U.S.

——, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989)." *Zant v. Moore,* 489 U.S. ——, 109 S.Ct. 1518, 103 L.Ed.2d 922 (1989).[6]

### B. *Scope of Review on Remand*

■ Contested on this remand is, *inter alia,* the extent to which the Supreme Court's remand order limits the issues which this court may consider and resolve. At oral argument, Moore strenuously asserted that by vacating this court's earlier *en banc* opinion and remanding this case expressly "for further consideration in light of *Teague v. Lane,*" the Supreme Court did not permit reconsideration of the abuse of the writ issues. Instead, he submits, the evident purpose of the remand order is to direct this court to consider whether the general rule prohibiting the retroactive application of "new" constitutional principles to cases pending on collateral review at the time those constitutional principles are announced should be applied to bar consideration of the merits of those claims which this court, in its earlier *en banc* decision, determined not to be abusive.[7] Although he cites no authority in

5. The questions presented were: (1) what type of proof establishes a "new law" exception to the abuse of the writ doctrine sufficient to excuse a habeas petitioner's abusive conduct in failing to assert the claim in a prior federal habeas corpus petition; and (2) what type of proof establishes that "ends of justice" would be served by relitigating death penalty sentencing phase claims previously adjudicated adversely to a habeas petitioner?

6. In *Teague v. Lane,* 489 U.S. ——, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), petitioner, a black man, was convicted by an all-white Illinois jury of attempted murder, armed robbery, and aggravated battery. During jury selection for petitioner's trial, the prosecutor used all of his peremptory challenges to exclude blacks. Petitioner's counsel moved for a mistrial, arguing that the prosecutor's use of peremptory challenges to strike blacks denied him the right to be tried by a jury that was representative of the community. The Illinois Appellate and Supreme Courts denied relief, and the Supreme Court denied certiorari.

Petitioner then initiated federal habeas proceedings pursuant to 28 U.S.C. § 2255, repeating his fair cross section claim. The district court denied relief. On appeal, a panel of the Seventh Circuit Court of Appeals agreed with petitioner's argument that the Sixth Amendment's fair cross section guarantee applied to the petit jury, as

well as to the jury venire, and held that petitioner had made out a prima facie case of discrimination. On rehearing *en banc,* the court rejected petitioner's fair cross section claim, holding that the fair cross section protection was limited to the jury venire.

On certiorari to the Supreme Court, petitioner urged the adoption of a new rule which would extend the fair cross section protection to the petit jury. The Court declined to address the merits of petitioner's contention, holding, instead, that if the Court were to adopt a new principle of constitutional law, petitioner could not benefit from that rule because the rule would not be available to petitioners whose cases were pending collateral review at the time the rule was announced. In an effort to clarify existing law relating to the rules of retroactivity, the Court announced a general rule prohibiting the retroactive application of "new laws" to cases that are "final" at the time those laws are announced, and enumerated two exceptions to that general rule.

7. Specifically, Moore contends that the Supreme Court's remand order presents this court with the following five issues, each of which relates to the *Teague* decision: (1) has the State, who has not asserted a retroactivity defense at any stage of these second federal habeas proceedings, waived its opportunity to assert the nonretroactivity of Moore's claims at this stage of the proceedings; (2) should the *Teague* retroactivity

support of the notion that the remand order was thus limiting, Moore emphasizes that the Court did not explicitly solicit further consideration of the specific issues presented before the prior *en banc* court. The State, in contrast, maintains that the Supreme Court, by issuing the remand order, did not intend to preclude this court from considering *all* of the issues in the case, including retroactivity, if appropriate, and abuse of writ.[8] By directing "further consideration in light of *Teague*," the State asserts, the Supreme Court was providing this court with guidance as to what constitutes "new law," such guidance not having been available at the time of this court's earlier *en banc* decision.

For reasons more elementary and compelling than those offered by the parties, we conclude that the Supreme Court's remand order does not preclude our revisitation of the abuse of the writ issues. Inherent in Moore's argument against reconsideration of those issues is the assumption that the Supreme Court's remand order constitutes an implicit approval of this court's earlier *en banc* disposition of those issues. We reject the basic premise of Moore's argument. Although the Supreme Court granted certiorari in this case, it vacated our earlier *en banc* decision, leaving in existence no appellate level disposi-

tion of the abuse of the writ issues, offered no comment on the correctness of that earlier decision, and remanded the case to this court with the general instruction that we further consider the case in light of *Teague*. We conclude that a reconsideration of the abuse of the writ issues is permitted by the Supreme Court's remand order.

## II.

Initially, we should decide whether Moore abused the writ by raising in his second federal habeas petition certain claims which he failed to present in his first federal petition. As noted, *supra* note 7, on remand Moore presents five additional issues for our consideration, each of which relates to the *Teague* decision. Because of our disposition of the abuse of the writ issues, we find it unnecessary to address those additional issues.[9]

### A. *Claims Presented*

Moore contends that the district court abused its discretion in dismissing, as an abuse of the writ, his *Estelle, Proffitt,* and *Gardner* claims. The State argues, as it did before the district court, that Moore's failure to assert in his first federal petition those claims which are now before us was inexcusable and, therefore, constituted an

---

rule be applied in the capital sentencing context; (3) assuming that the *Teague* rule is generally applicable to capital cases, should it be applied retroactively to capital inmates whose cases were pending collateral review at the time *Teague* was announced; (4) do some of Moore's claims fall outside the reach of the *Teague* rule (*i.e.,* do any of the claims involve issues which do not constitute "new law" for purposes of a retroactivity analysis); and (5) assuming that all or some of Moore's claims fall within the reach of *Teague* (*i.e.,* are based on principles which constitute "new law" for purposes of a retroactivity analysis), do any of those "new law" claims fall within either of the exceptions to the *Teague* rule?

8. Both parties concede that they conceive of the abuse of the writ and retroactivity issues as being two separate analyses which must be conducted pursuant to a petitioner's filing of a successive federal habeas petition. Moore characterizes the issues as two procedural hurdles which must be cleared before a court will address the merits of the claims presented. The State asserts that the abuse of the writ issue

involves essentially a procedural analysis, the conduct of which is a prerequisite to any disposition of claims on their merits. Further, the State maintains that the issue of retroactivity is one addressed to the *merits* of claims presented and, hence, cannot be resolved until the abuse of the writ issue has been determined. The parties' conception of the *interrelationship* between the two issues is irrelevant to the present discussion; Moore urges this court to adhere to its prior finding of no abuse of the writ as to the *Proffitt, Estelle,* and *Gardner* claims—to declare Moore as having successfully cleared that procedural hurdle—and to proceed immediately to judging his attempt to clear the second hurdle—retroactivity—on his course to relief. The State, in contrast, asserts that both "hurdles" remain in Moore's path.

9. Because we conclude that Moore abused the writ by failing to include in his initial federal habeas petition the issues which he presents for the first time in his second federal habeas petition, we need not address whether the *Teague* rule should be applied to preclude an evaluation of the merits of Moore's claims.

abuse of the writ. The State notes that Moore has been represented by counsel throughout all stages of his collateral proceedings, that there are no newly discovered facts in Moore's case—the facts now being offered in support of his "new" claims having been well known at the time he filed his first federal petition—and that the federal constitutional implications of those facts, now being asserted by Moore, were plainly discernable from relevant case law that was in existence at that time. With respect to the *Estelle* and *Proffitt* claims, the State contends that Moore, who was represented by counsel at all times relevant to this appeal, is chargeable with the knowledge—actual and constructive— that counsel possessed at the time Moore filed his first habeas petition, and that counsel, at that time, reasonably should have anticipated those claims. Moore neither disputes that he has been represented by counsel at all stages during his direct and collateral proceedings, nor asserts that he is attempting to rely on newly discovered facts. His disagreement with the State and the district court, at least with respect to his *Estelle* and *Proffitt* claims, concerns the legal significance of the facts. Specifically, Moore contends that his claims are based on new principles of constitutional law which were not recognized until *after* Moore filed his first federal habeas petition; because those principles were established *after* Moore filed his first petition, *he* cannot be said to have intentionally abandoned, intentionally withheld, or inexcusably neglected to have asserted those claims in his petition. Instead, Moore submits, the change in the law constitutes a legal excuse justifying the delayed assertion of his claims.

With respect to his third claim—that which is based on *Gardner v. Florida*—Moore acknowledges that the claim is not based on newly discovered facts or new principles of federal constitutional law. He does maintain, however, that he did not deliberately withhold this claim from his first federal petition (as evidenced by his attempt to amend that petition to include this claim), and therefore, did not abuse the writ with respect to this claim. Alternatively, he asserts that notwithstanding his

failure to include this claim in his earlier petition, the "ends of justice" require an evaluation of the claim on the merits.

As to each of the claims presented by Moore, we must review the district court's decision for an abuse of discretion. *Sanders v. United States*, 373 U.S. 1, 18, 83 S.Ct. 1068, 1079, 10 L.Ed.2d 148 (1963); *Darden v. Dugger*, 825 F.2d 287, 292 (11th Cir.1987). After outlining the basic principles governing the abuse of the writ analysis, we shall address each of Moore's claims in turn.

### B. *Abuse of the Writ Doctrine*

According to Rule 9(b) of the Rules Governing Section 2254 Cases, a federal court may dismiss a second or subsequent petition for federal habeas corpus relief if it finds that the petition "fails to allege new or different grounds for relief and the prior determination was on the merits or, if new and different grounds are alleged, [it] finds that the failure of the petitioner to assert those grounds in a prior petition constituted an abuse of the writ." 28 U.S.C. foll. § 2254 Rule 9(b) (1982). This rule is stated in slightly different terms in section 2244, 28 U.S.C. (1982), which provides that a court may dismiss a petition summarily unless the petition "alleges and is predicated on a factual or other ground not adjudicated on the hearing of the earlier application for the writ, and unless the court, justice, or judge is satisfied that the applicant has not on the earlier application deliberately withheld the newly asserted ground or otherwise abused the writ." A principal reason underlying these rules is to promote the finality of criminal proceedings by requiring petitioners to include all of their claims in a single habeas petition in the federal district court. *See Kuhlmann v. Wilson*, 477 U.S. 436, 451–52, 106 S.Ct. 2616, 2624–26, 91 L.Ed.2d 364 (1986) (plurality opinion). For purposes of this opinion, we must distinguish between the two classes of claims those rules describe: the first consists of "successive" claims—those which were raised and considered on their merits in an earlier federal habeas petition—and the second consists of "new" claims—those which are being raised for

the first time in the subsequent petition.[10] Presently, we are concerned only with claims that are included in the latter category.

■ In evaluating "new" claims to determine whether they should be entertained on their merits, a district court may conclude that the delayed presentation of those claims constitutes an abuse of the writ by finding that either petitioner or his counsel intentionally withheld or intentionally abandoned the claims on the earlier petition, or inexcusably neglected to include those claims in the earlier petition. *See Woodard v. Hutchins*, 464 U.S. 377, 379 & n. 3, 104 S.Ct. 752, 753 & n. 3, 78 L.Ed.2d 541 (1984) (Powell, J., concurring, joined by four other justices); *Demps v. Dugger*, 874 F.2d 1385 (11th Cir.1989); *Witt v. Wainwright*, 755 F.2d 1396, 1397 (11th Cir.), *cert. denied*, 470 U.S. 1039, 105 S.Ct. 1415, 84 L.Ed.2d 801 (1985); *Stephens v. Kemp*, 721 F.2d 1300, 1303 (11th Cir. 1983); *Potts v. Zant*, 638 F.2d 727, 740–41 (5th Cir. Unit B), *cert. denied*, 454 U.S. 877, 102 S.Ct. 357, 70 L.Ed.2d 187 (1981); *see also Funchess v. Wainwright*, 788 F.2d 1443, 1445 (11th Cir.1986) (per curiam); *Haley v. Estelle*, 632 F.2d 1273, 1275 (5th Cir. Unit A 1980); *Paprskar v. Estelle*, 612 F.2d 1003 (5th Cir.1980), *cert. denied*, 449 U.S. 885, 101 S.Ct. 239, 66 L.Ed.2d 111 (1980). An abuse might not be found where the district court finds that a petitioner was unaware, at the time he filed his first petition, of the specific legal or factual grounds supporting his "new" claim, *see Booker v. Wainwright*, 764 F.2d 1371, 1376 (11th Cir.), *cert. denied*, 474 U.S. 975, 106 S.Ct. 339, 88 L.Ed.2d 324 (1985); *cf. Demps*, 874 F.2d at 1392 (abuse can occur where petitioner deliberately refrains from asserting one of two grounds for relief in the first petition in an effort to secure two

hearings instead of one) (citing *Sanders v. United States*, 373 U.S. 1, 18, 83 S.Ct. 1068, 1078, 10 L.Ed.2d 148 (1963); *Jones v. Estelle*, 722 F.2d 159, 163–64 (5th Cir.1983) (*en banc*) (citing *Wong Doo v. United States*, 265 U.S. 239, 44 S.Ct. 524, 68 L.Ed. 999 (1924)), or that the law has changed since the earlier petition, *Sanders*, 373 U.S. at 17, 83 S.Ct. at 1078; *Tucker v. Kemp*, 818 F.2d 749, 752 (11th Cir.1987); *see Demps*, 874 F.2d at 1392. In some instances, however, an abuse might be found even if the law has changed since the earlier petition. *See, e.g., McCorquodale v. Kemp*, 832 F.2d 543, 544 (11th Cir.1987); *Bowden v. Kemp*, 793 F.2d 273, 275 & n. 4 (11th Cir.), *cert. denied*, 477 U.S. 910, 106 S.Ct. 3289, 91 L.Ed.2d 576 (1986). *Cf. Coleman v. Saffle*, 869 F.2d 1377, 1381 (10th Cir.1989). Our task in this case is definitively to decide the standard by which courts of this circuit henceforth will judge the abusive nature of petitions alleging "new law" claims.

■ Once the abuse of the writ issue has been raised, the petitioner has the burden of answering that allegation by proving, by a preponderance of the evidence, that he has not abused the writ. *Sanders*, 373 U.S. at 10–11, 83 S.Ct. at 1074–75; *Price v. Johnston*, 334 U.S. 266, 292, 68 S.Ct. 1049, 1063, 92 L.Ed. 1356 (1948); *see also Funchess*, 788 F.2d at 1445; *Jones*, 722 F.2d at 164. Hence, once the state contends that the petitioner's delayed presentation of his claim constitutes an abuse of the writ, the petitioner has the burden of satisfying the district court that the delay is excusable. As noted, determining the sufficiency of the petitioner's explanation is a matter committed to the sound discretion of the habeas judge. *Sanders*, 373 U.S. at 18, 83 S.Ct. at 1079; *Darden*, 825 F.2d at 292.

---

**10.** Also, for purposes of this opinion, we must distinguish between "new" claims and so-called "new law" claims. "New" claims are those which are presented for the first time in a second or subsequent federal habeas petition and which are subject to summary dismissal if a petitioner's failure to present them in his initial federal habeas petition constituted an abuse of the writ. "New law" claims are a particular *type* of "new" claim—those which are based on an intervening change in the law that occurred

between the filing of a petitioner's first and subsequent federal habeas petitions. As discussed, *infra* pp. 1506–08, "new law" claims will survive abuse of the writ scrutiny *only* if a reasonably competent attorney (assuming that petitioner is represented by counsel), at the time of filing petitioner's first federal habeas petition, could not reasonably have anticipated the changes in the law on which those claims are based.

■■■ Notably, there are two exceptions to the application of the foregoing principles. First, the abuse of the writ analysis may be circumvented altogether if the district judge finds, judging strictly from the records and pleadings, that the "new" or potentially abusive claims are conclusively without merit. *Sanders,* 373 U.S. at 15, 83 S.Ct. at 1077; *see also Stephens,* 721 F.2d at 1303. Second, notwithstanding a petitioner's abusive conduct in failing to present a claim in a prior federal habeas petition, the claim may be adjudicated on its merits if the "ends of justice" so require. *Sanders,* 373 U.S. at 18–19, 83 S.Ct. at 1079; *see also Demps,* 874 F.2d at 1392; *Ritter v. Thigpen,* 828 F.2d 662, 666 (11th Cir.1987); *Mulligan v. Kemp,* 818 F.2d 746, 747 (11th Cir.1987).

### C. *"New Law" Exception to the Abuse of the Writ Doctrine*

■■■ As noted, a change in the law which occurs between the filing of a petitioner's first and subsequent federal habeas petitions may excuse a petitioner's failure to assert in his first petition a claim that is based on that change. *Sanders,* 373 U.S. at 17, 83 S.Ct. at 1078; *Tucker,* 818 F.2d at 752; *see Demps,* 874 F.2d at 1392. This court previously has intimated, in *dicta,* that determination of whether the change is sufficient to excuse the omission of the claim is an objective inquiry, which seeks to ascertain whether petitioner or his counsel reasonably should have known about the claim at the time the earlier habeas petition was filed. *See, e.g., McCorquodale v. Kemp,* 832 F.2d 543, 544 (11th Cir.1987) (indicating a "new law" claim is one that is based on legal principles "not reasonably known" until after the first federal habeas petition); *Bowden v. Kemp,* 793 F.2d 273, 275 & n. 4 (11th Cir.), *cert. denied,* 477 U.S. 910, 106 S.Ct. 3289, 91 L.Ed.2d 576 (1986) (petitioner had rea-

sonable basis upon which to fashion a claim). In this case, the State's arguments assume that this standard applies. *Moore,* on the other hand, argues implicitly that the determination is strictly subjective. Today, we expressly adopt the objective standard as the governing standard.[11]

As with the general rules governing the disposition of subsequent habeas petitions, the standard that is applied to determine whether a change in the law is sufficient to excuse the omission of a claim from an earlier petition must accommodate two competing, though compelling, interests: society's interest in securing finality to judgments, and a petitioner's interest in securing a full and fair opportunity to vindicate his constitutional rights. *See generally Kuhlmann,* 477 U.S. at 451–52, 106 S.Ct. at 2625–26. If the standard were purely subjective, depending on a petitioner's actual knowledge of the claim at the time of filing of the earlier petition, the "new law" exception would swallow the abuse rules, and society's interest in finality would be seriously undermined.

An objective standard that seeks to ascertain if reasonably competent counsel, at the time of filing of the first petition, reasonably should have anticipated a later change in the law, however, would better accommodate the principles of finality and fairness than the subjective standard. The objective standard would promote certainty in the law and uniformity of results from case-to-case, by making characterization of the change in the law depend on the objective unforeseeability of the change and by saddling petitioners with the burden or the benefit of what the "reasonably competent attorney" could anticipate. In cases involving "clear breaks with past precedent,"[12] or a deliberate breaking of new constitutional ground, a petitioner's failure to include such a claim in an initial federal petition always would be excused under

---

**11.** Because the petitioner in this case was represented by counsel at all times relevant to this appeal, our discussion is limited to the "new law" inquiry as it relates to petitioners who were represented by counsel at the time their first federal petition was filed.

**12.** A case involves a "clear break with past precedent" when it explicitly overrules a past

precedent of the Supreme Court, disapproves a practice the Supreme Court arguably sanctioned in prior cases, or overturns a longstanding and widespread practice to which the Supreme Court has not spoken, but which a near-unanimous body of lower court authority expressly has approved. *See United States v. Johnson,* 457 U.S. 537, 551–52, 102 S.Ct. 2579, 2587–88, 73 L.Ed.2d 202 (1982).

this standard. That is so because such changes, by definition, are virtually unforeseeable, and reasonably competent counsel, therefore, cannot be said to have reasonably anticipated such changes. *See also Reed v. Ross,* 468 U.S. 1, 16, 104 S.Ct. 2901, 2910, 82 L.Ed.2d 1 (1984) (a rule requiring petitioners to raise a truly novel issue is not likely to serve any functional purpose). The more difficult, and typical, cases involve changes that are much less marked. The objective "new law" inquiry is intended to facilitate the analysis of claims that are based on those changes.

We recognize, therefore, that the purely objective standard is the one that should control disposition of "new law" abuse of the writ claims. In so doing, we make a few observations. As noted, the rule generally represents an equitable accommodation of two competing, paramount interests: society's interest in finality of judgments and a petitioner's interest in securing a full and fair opportunity to vindicate his constitutional rights. Consistent with these general equitable principles is another notion: it is not unreasonable or manifestly inequitable to charge a petitioner with the knowledge of a reasonably competent attorney or, if his attorney fails to anticipate a change which reasonably competent counsel reasonably could have anticipated, to charge him with his attorney's mistakes. If it is appropriate to charge litigants with their attorneys' mistakes in situations in which litigants have a Sixth Amendment right to effective assistance of counsel, it certainly is reasonable to charge litigants with their attorneys' mistakes in situations in which no entitlement to effective assistance of counsel exists. *See Pennsylvania v. Finley,* 481 U.S. 551, 555, 107 S.Ct. 1990, 1993, 95 L.Ed.2d 539 (1987) (citing *Johnson v. Avery,* 393 U.S. 483, 488, 89 S.Ct. 747, 750, 21 L.Ed.2d 718 (1969)) (prisoners do not have a constitutional right to counsel when mounting collateral attacks to their convictions or sentences); *Wainwright v. Torna,* 455 U.S. 586, 587–88, 102 S.Ct. 1300, 1301, 71 L.Ed.2d 475 (1982) (petitioner cannot be deprived of effective assistance of counsel where he has no constitutional right to counsel); *see also Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986) ("the mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for procedural default"); *Smith v. Newsome,* 876 F.2d 1461, 1466 (11th Cir.1989) (citing *Murray,* 477 U.S. at 488, 106 S.Ct. at 2645) ("We hold parties represented by counsel responsible for their mistakes.").

The rule we adopt is analogous to the "new law" standard that the Supreme Court has adopted and applied in the procedural default context for establishing "cause," and which the district court in this case relied on in addressing Moore's abuse of the writ claims. In addressing Moore's claims, the district court specifically relied on the new law standard for establishing cause which was articulated in *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982).[13] *Engle,* to the extent

---

13. In *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982), Isaac, a state prisoner, raised in his federal habeas petition a claim that one of the jury instructions given at trial violated his due process rights. At the time of Isaac's conviction, Ohio law required defendants to prove an affirmative defense by a preponderance of the evidence. Ten months later, however, the Ohio Supreme Court held that jury instructions to that effect were unconstitutional. The district court summarily dismissed his claim, holding that it was procedurally barred because Isaac had failed to comply with an Ohio court rule mandating contemporaneous objections to jury instructions.

Reversing the district court, the Sixth Circuit Court of Appeals concluded that *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), did not preclude consideration of Isaac's

due process claim. Instead, the court found that Ohio courts consistently had upheld the constitutionality of the complained-of jury instructions prior to holding them unconstitutional, that any attempt by Isaac to object to the instructions at trial probably would have been futile, and the futility of objecting to the instructions would have supplied adequate cause for Isaac's waiver.

Reversing the Sixth Circuit's decision, the Supreme Court reaffirmed the *Sykes* rule, and held that Isaac had waived his claim by failing to object to the jury instructions at trial. The Court found that "cause" for Isaac's default could not be based on Isaac's assertion that he could not have known at that time that the state jury instructions were constitutionally infirm. In so doing, the Court emphasized that numerous defendants previously had relied on *In re*

that it enumerated a general rule, indicated that petitioners might have a duty to anticipate changes in the law at the threat of having later claims based on those changes barred by principles of procedural default. The *Engle* standard was refined in *Reed v. Ross*, 468 U.S. 1, 13–16, 104 S.Ct. 2901, 2909–10, 82 L.Ed.2d 1 (1984), a case which was decided three weeks after the district court in this case announced its decision. In *Reed*, the Court considered whether and to what extent "the novelty of a constitutional issue at the time of a state-court proceeding could ... give rise to cause for defense counsel's failure to raise the issue in accordance with applicable state procedures." *Reed*, 468 U.S. at 13, 104 S.Ct. at 2909. After noting the inequities inherent in a broad rejection of the notion that a "new law" may provide "cause" sufficient to relieve a petitioner's procedural default, the court concluded that "where a constitutional claim is so novel that *its legal basis is not reasonably available to counsel*, a defendant has cause for his failure to raise a claim in accordance with state procedures." *Reed*, 468 U.S. at 16, 104 S.Ct. at 2910 (emphasis added). The court went on to note that the question of whether an attorney has a "reasonable basis" upon which to develop a legal theory can arise in a variety of contexts, and then held that one of those contexts is where the Supreme Court "has articulated a constitutional principle that has not been previously recognized but which is held to have retroactive application." *Id.* at 17, 104 S.Ct. at 2911.

Having outlined the basic rules governing the abuse of the writ analysis and determined the standard by which "new law" claims should be judged, we next must evaluate Moore's claims in light of those rules.

### D. *Discussion*

#### 1. *Estelle v. Smith* claim.

 Moore presents two "new law" claims in his current federal habeas petition. The first claim, based on *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), is that the state failed to inform him of his right to remain silent and of his right to consult with counsel prior to the probation officer's presentence interview of him, in violation of the Fifth, Sixth, and Fourteenth amendments.

In *Estelle v. Smith*, the trial court, *sua sponte*, ordered that the defendant undergo a psychiatric examination to determine his competency to stand trial for a capital crime. The judge subsequently found the defendant competent and, following a trial, a jury convicted him of the capital crime. At the sentencing stage of the proceeding, the state offered the testimony of the court-appointed psychiatrist, who had interviewed the defendant solely for competency purposes, to prove the defendant's future dangerousness, a condition precedent to the imposition of the death penalty. Basing his testimony on his competency examination of the defendant, the psychiatrist testified that he believed the defendant always would be dangerous. Relying on this testimony, the jury imposed the death penalty. *See Estelle v. Smith*, 451 U.S. at 456–60, 101 S.Ct. at 1870–71.

Affirming a unanimous panel of the former Fifth Circuit, the Supreme Court concluded that the State's use of the psychiatrist's testimony had violated the defendant's Fifth, Sixth, and Fourteenth amendment rights. Analogizing the psychiatric examination to the custodial interrogation in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Court held that the defendant should have received a *Miranda* warning prior to the interview. *See Estelle*, 451 U.S. at 466–69,

*Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), and *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), in objecting to similar jury instructions, despite the fact that the defendants' claims often countered well-established principles of law. *Engle*, 456 U.S. at 132, 102 S.Ct. at 1574. In light of the many challenges made by other defendants, the

Court "could not say that state prisoners, such as Isaac, lacked the tools necessary to construct their constitutional claim." Without defining the precise scope of its rule, the Court thus established some duty on the part of habeas petitioners to anticipate future changes in the law at the threat of having claims barred by principles of procedural default.

101 S.Ct. at 1875–76. Moreover, the Court unanimously concluded that under the Sixth and Fourteenth amendments, the psychiatric examination was a critical stage of the criminal proceedings; accordingly, the State should have forewarned the defendant's attorney that the results of the competency examination could be used for reasons other than to determine the defendant's competency to stand trial. Because the defendant's attorney had not been so informed, the State had denied the defendant his right to consult with counsel during a critical stage of the proceedings. *See id.* at 469–72, 101 S.Ct. at 1876–77.

The State's primary contention with respect to his claim is that Moore's counsel, in 1978 (when Moore's first federal habeas petition was filed), reasonably should have anticipated the holding in *Estelle* (*i.e.*, the application of the *Miranda* protections to capital sentencing proceedings). In support of its position that counsel should have anticipated the *Estelle* holding, the State refers to *Battie v. Estelle*, 655 F.2d 692 (5th Cir.1981), in which the former Fifth Circuit held, for purposes of retroactivity, that *Estelle* did not constitute a new constitutional principle and, therefore, was to be applied retroactively to cases pending collateral review at the time *Estelle* was announced. The State's reference to *Battie* is specifically intended to support the argument that *Estelle* did not represent a clear break with past precedent—a condition that almost always would excuse a petitioner's failure to raise a claim in an earlier petition—but was a natural and foreseeable extension of existing constitutional principles into a new factual context. The State's argument seeks to charge Moore with a duty to anticipate that *extension* and to characterize that claim as having been "reasonably available" to Moore's counsel at the time Moore filed his first federal habeas petition.

Moore, in contrast, asserts that *Estelle* is "new law" for purposes of the abuse of the writ analysis. Moore's position is, therefore, fundamentally at odds with the State's position regarding the standard governing "new law" claims. Moore insists that this court must evaluate his "knowledge" of a potential *Estelle* claim at the time of filing of his first federal petition. The court, he maintains, must ascertain whether he intentionally or deliberately refrained from presenting the *Estelle* claim in his first petition (*i.e.*, did he have knowledge of a potential *Estelle* claim yet refrain from presenting the claim until it was explicitly available?). Moore's proposed inquiry essentially is subjective, with the "newness" of a constitutional claim depending not on the objective foreseeability of a "change" in the law, but, instead, depending on the foreseeability of the claim to a particular petitioner.[14] In support of his position, Moore asserts that the equitable considerations inherent in Rule 9(b) of the Rules Governing Section 2254 Cases disallow a bar of this claim by the abuse of the writ doctrine.

As noted, in analyzing Moore's claims for an abuse of the writ, the district court analogized the "new law" standard articulated in *Engle* for establishing "cause" sufficient to excuse a petitioner's procedural default. The court concluded that Moore was under a duty to raise in his first habeas petition constitutional claims, based on intervening changes in the law, which could have been anticipated by Moore's counsel. Because, according to the court, *Estelle* could have been anticipated by Moore's counsel, Moore's omission of the *Estelle* claim from his earlier petition was inexcusable.

Applying to the facts of this case the "new law" standard we have articulated for analyzing potentially abusive claims, it is evident that the district court did not abuse its discretion in concluding that Moore's failure to raise the *Estelle* claim in his first federal habeas petition constituted

---

**14.** Because, as Moore asserts, the focus is on a petitioner's conduct, conceivably, under this inquiry, a petitioner could avoid having a claim barred by abuse principles if he had no knowledge of the "new law" but his attorney did have knowledge of it. This implication of Moore's argument is clearly contrary to law of this and other circuits, which looks at what *counsel* knew or should have known at the time the first petition was filed to determine whether a *petitioner's* conduct was abusive.

an abuse of the writ. *Estelle* is significant to Moore's case not simply because it extended the Fifth and Sixth amendment rights recognized in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), to interrogations conducted by court-appointed psychiatrists; instead, it is significant because it recognized the applicability of the protections described in *Miranda* to the sentencing phase of capital proceedings. Our inquiry seeks not to determine whether, in 1978, reasonably competent counsel reasonably could have anticipated the application of *Miranda* protections to interrogations conducted by probation officers. Instead, the "new law" inquiry, described above, seeks to determine whether, in November, 1978—the time of filing of Moore's first federal habeas petition—reasonably competent counsel reasonably could have anticipated the eventual application of *Miranda* to the sentencing phase of Georgia's bifurcated capital proceedings. Relevant to that determination is the status of Georgia's capital punishment scheme in 1978, the adversarial nature of the sentencing phase of the capital scheme, and the extent to which constitutional protections other than those recognized in *Miranda* had been recognized and applied to capital sentencing proceedings. Hence, we must determine whether reasonably competent counsel, searching the legal horizon in 1978, could have been expected to argue in favor of the application of *Miranda* to the sentencing proceedings in this case.

In 1972 and pursuant to the Supreme Court's decision in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), which held unconstitutional Georgia's death penalty statute, the Georgia legislature enacted new legislation governing capital trial proceedings. The new law, which was held constitutional by the Supreme Court in *Gregg v. Georgia*, 428 U.S.

153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), provided for bifurcated capital proceedings, with the stages being devoted to guilt determination and to sentencing, respectively. Each stage clearly was intended to be adversarial.[15]

It was not immediately obvious following the Supreme Court's *Gregg* decision that the full panoply of constitutional protections normally accorded to a defendant's merits trial would be applied to capital sentencing phases in general or to Georgia's in particular. By 1977, however, the Supreme Court had recognized that some of those protections would apply. For example, the Court, in *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), recognized the applicability of certain Eighth and Fourteenth amendment protections to capital sentencing proceedings, stating "the sentencing process, as well as the trial itself, must satisfy the Due Process Clause." *Gardner*, 430 U.S. at 358, 97 S.Ct. at 1204.

In light of the Supreme Court's clear recognition, by 1978, that some of the constitutional protections afforded to capital defendants during their merits trials applied as well to sentencing proceedings, a reasonably competent attorney reasonably could have anticipated the eventual application of the protections established in *Miranda* to capital sentencing proceedings. Moore's failure to make an *Estelle*-type claim in his first federal habeas petition, therefore, is inexcusable.

2. *Proffitt v. Wainwright* claim.

█ In his second federal habeas petition Moore also presented for the first time in federal court a claim, based on this court's decision in *Proffitt v. Wainwright*, 685 F.2d 1227 (11th Cir.1982), *modified*, 706 F.2d 311 (11th Cir.), *cert. denied*, 464 U.S. 1002, 104 S.Ct. 508, 78 L.Ed.2d 697 (1983), that the admission into evidence of the

---

**15.** During the sentencing phase, for example, opening statements were to be made by the prosecution and the defense. Thereafter, both sides were given the opportunity to present evidence of aggravating and mitigating circumstances in an effort to establish an appropriate sentence—death or life imprisonment. Following the close of all of the evidence, both sides argued their case to the jury, the court instructed the jury on the law, and the jury retired to deliberate its verdict. The judge then imposed the appropriate sentence in accordance with the jury's verdict. Cases tried to the court, instead of to a jury, followed the same procedures, except that the judge replaced the jury as the finder of fact and the sentence.

presentence investigation report violated his Sixth Amendment right to confront and cross-examine the witnesses whose statements the report memorialized. Applying the "new law" analysis enumerated in Section II(c), we conclude that Moore abused the writ with respect to this claim, too.

In *Proffitt,* the defendant submitted to examination by two psychiatrists prior to sentencing. One of the psychiatrists subsequently was unable to attend the defendant's sentencing hearing; hence, his views concerning the defendant's competence and mental state were submitted solely in a written report. The defendant requested, but did not receive, an opportunity to cross-examine the psychiatrist concerning the report. *Proffitt,* 685 F.2d at 1250–51 & n. 36a.

The *Proffitt* court initially noted that the rights secured by the Sixth Amendment, including the right to cross-examine adverse witnesses, apply only to critical stages of the trial. *Id.* at 1252 (citations omitted). Next, acknowledging that the protections of the Sixth Amendment do not apply with full force in all sentencing proceedings, the court noted that the applicability of cross-examination rights to capital sentencing hearings "has not been specifically addressed by the Supreme Court and is an issue of first impression in this Circuit." *Id.* at 1253. The court concluded that Proffitt was entitled, under the Sixth Amendment, to cross-examine the psychiatrist at his sentencing hearing. *Id.* at 1255.

The State asserts that the parties' contentions with respect to this claim are essentially identical to those raised with respect to the *Estelle* claim. The State asserts that Moore's counsel, in 1978, reasonably should have anticipated the holding in *Proffitt* (*i.e.,* the extension of an existing constitutional principle—the right to confront witnesses—into the context of capital sentencing proceedings). The State maintains that the *Proffitt* holding was part of a foreseeable trend toward extending various constitutional protections to capital sentencing proceedings, and, as such, did not constitute a clear, unanticipatable break with past precedent. Because Moore's counsel, scanning the legal horizon in 1978, reasonably could have anticipated

the *Proffitt* holding, the State argues, Moore should be found to have been inexcusably neglectful in omitting the claim from his first federal petition. Moore, in contrast, asserts that *Proffitt* is "new law" for purposes of the abuse analysis precisely because he did not have knowledge of a potential *Proffitt* claim at the time he filed his first federal petition. Again, Moore insists that this court, in determining whether he had knowledge of a possible *Proffitt* claim, must ascertain whether Moore was aware of the potential claim (*i.e.,* recognized the factual and legal underpinnings of the claim) yet deliberately refrained from presenting the claim in his first petition.

For the same reasons we concluded Moore abused the writ by failing to raise his *Estelle* claim in his first petition, we conclude that his failure to raise his *Proffitt* claim in that petition is inexcusable. Presaging *Proffitt* was a long line of cases in which Sixth Amendment protections were extended in a variety of circumstances and another line which addressed the special safeguards that are constitutionally mandated in capital proceedings. For example, in 1965, the Supreme Court held, in two separate cases, that the Sixth Amendment provides defendants with the right to cross-examine adverse witnesses in state criminal proceedings. *See Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965); *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). Moreover, the Court repeatedly has recognized that the right to cross-examine adverse witnesses, like the right to counsel, is a fundamental requirement for a fair trial and for ensuring due process of law. *See Chambers v. Mississippi,* 410 U.S. 284, 294–95, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973); *Pointer,* 380 U.S. at 405, 85 S.Ct. at 1068; *In re Oliver,* 333 U.S. 257, 273, 68 S.Ct. 499, 507, 92 L.Ed. 682 (1948).

As this court recognized in *Proffitt,* the right to cross-examination applies only to "critical stages of the trial." *Proffitt,* 685 F.2d at 1252. During the 1960s and 1970s, the extent to which various phases of the criminal process, including sentencing proceedings, constituted "critical stages" for

purposes of the Sixth Amendment was unsettled. *See, e.g., United States v. Fatico,* 579 F.2d 707, 713–14 (2d Cir.1978). The clear trend, however, was toward expanding the full panoply of Sixth Amendment protections, including confrontation rights, into new contexts. *See, e.g., Mempa v. Rhay,* 389 U.S. 128, 134, 88 S.Ct. 254, 256–57, 19 L.Ed.2d 336 (1967) (recognizing the Sixth Amendment right to counsel during a sentencing and probation revocation hearing); *see also* Taparauskas, *An Argument for Confrontation at Sentencing: Bringing the Offender into the Sentencing Process,* 8 Cumb.L.Rev. 403, 426–40 (1977) (discussing trend toward expanded confrontation right). In light of that trend, we conclude that, in 1978, reasonably competent counsel reasonably could have anticipated the extension of Sixth Amendment rights, including the right of confrontation, to capital sentencing proceedings. The district court did not abuse its discretion by concluding that Moore's failure to include this claim in his first federal petition constituted an abuse of the writ.

3. *Gardner v. Florida* claim.

■ Moore's claim, based on *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), is that the sentencing judge imposed the death penalty based in part on a presentence investigation report that neither petitioner nor his counsel had "any meaningful opportunity to review, correct, or supplement," in violation of the Eighth and Fourteenth amendments. This claim obviously is not based on any alleged new legal development because *Gardner* was decided before Moore filed his first federal petition.

This claim has an unusual procedural history. Moore presented this claim in his first state habeas petition and the state court rejected the claim on the merits, finding that Moore's trial counsel had received a copy of the report prior to his sentencing hearing. When Moore filed his first federal petition in November 1978, he did not include a *Gardner* claim. This omission appears to have been deliberate because the claim is noted in the procedural history portion of his petition and because, at the time he filed his first federal petition,

Moore was represented by the same attorney, James C. Bonner, Jr., who had prepared Moore's first state habeas petition. Moore did not attempt to add his *Gardner* claim to his first federal petition until October 1980, when his newly appointed habeas counsel sought leave to amend the petition. The district court denied Moore's motion for leave to amend the petition to add the *Gardner* claim, citing in support thereof Moore's delay in bringing the claim to federal court, explicit reference to the claim in the procedural history portion of his original petition which indicated that Moore was fully aware of it when he filed his first petition, and continuous representation by counsel during his state and federal collateral attacks. *Blake v. Zant,* 513 F.Supp. 772, 805 (S.D.Ga.1981). Without specifically addressing the issue, the district court, in denying Moore's motion, indicated its belief that the *Gardner* claim was meritless:

> [C]ounsel made explicit reference to the presentencing report issue in the original habeas petition, thus demonstrating beyond doubt that this matter had been considered by him and rejected as a basis for relief before this Court. Counsel's decision cannot be seen as unfounded. This question was considered at length by the state habeas tribunal. Testimony was received from [Moore's trial counsel] and an affidavit was introduced from the officer who prepared the report. Upon examining this evidence and the trial transcript, which appears to show that the report was turned over to [Moore's] trial counsel, the Court ruled adversely to the petitioner. No new evidence has been suggested which would cast doubt on this determination.

*Id.* (citation omitted). Clearly, the court viewed the claim as having been litigated fully and correctly in the state court. The Eleventh Circuit affirmed the district court's denial. *Moore v. Balkcom,* 716 F.2d 1511, 1527 & n. 15 (11th Cir.1983) (on rehearing). Moore raised the issue again in his second federal petition, and the district court denied the claim as an abuse of the writ. *Moore v. Zant,* 734 F.2d 585, 598 (11th Cir.1984) (district court opinion attached).

Moore argues that his failure to raise this claim in his first federal petition cannot be considered an abuse of the writ in light of his attempt to amend that petition to add the claim. Alternatively, he asserts that even if his conduct were to be considered abusive, the "ends of justice" mandate consideration of this claim on its merits. In contrast, the State contends that Moore did abuse the writ by failing to raise this issue properly before the district court and that, in any event, the "ends of justice" do not require consideration of its merits.

We need not determine whether Moore's attempt to amend his earlier petition excused his omission of the *Gardner* claim, because we conclude that the claim is meritless. Moore had a full and fair opportunity to litigate the claim in his state habeas proceedings, but presented no evidence in support of it. Instead, the record developed in the state habeas proceedings demonstrates that Moore's counsel was presented with a copy of the presentence investigation report prior to his sentencing hearing; that his counsel requested and was given a recess to review the report; and that, upon reconvening, neither Moore nor his counsel voiced any objection to the contents of the report. Moore now seeks in his second habeas petition in federal court to present evidence that certain information upon which the trial court relied in sentencing him to death was erroneous, but he asserts no reason why he failed to present such evidence when he had a full and fair opportunity to do so in the state collateral proceedings. Accordingly, we conclude that the district court did not abuse its discretion in dismissing the claim.

Additionally, assuming that Moore's failure to include the *Gardner* claim in his first federal habeas petition was abusive, we observe that the "ends of justice" do not entitle Moore to relief on the *Gardner*

claim even had he not had an opportunity to present it. Historically, to prove that the "ends of justice" require consideration of an otherwise abusive claim, a petitioner had to show that the "alleged error precluded the development of true facts or resulted in the admission of false ones on a material question involving the sentence." *See Ritter v. Thigpen*, 828 F.2d 662, 666 (11th Cir.1987). In *Kuhlmann v. Wilson*, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986), however, a plurality of the Supreme Court suggested that a petitioner must make a "colorable showing of factual innocence," *id.* 106 S.Ct. at 2627, in order to prove that the "ends of justice" required a consideration of the abusive claim. We need not decide which of these tests governs, for we conclude that Moore has failed to satisfy either test. Under Georgia law, a defendant may be sentenced to death even if the only aggravating circumstance present is that the murder was committed during the course of an armed robbery. *See Jones v. State*, 243 Ga. 820, 256 S.E.2d 907, 914 (1979). By attacking only that portion of the presentence investigation report which dealt with the accuracy of facts supporting the finding that nonstatutory aggravating circumstances were present, Moore has not successfully demonstrated that his sentence would not have been the same even if he prevailed on his argument regarding the nonstatutory aggravating circumstances. *See Dugger v. Adams*, 489 U.S. ——, ——, 109 S.Ct. 1211, 1217 n. 6, 103 L.Ed.2d 435 (1989). Without such proof, Moore cannot make a "colorable showing of factual innocence" of the death sentence imposed in this case, nor can he demonstrate that the error in the sentencing proceeding which he challenges affected a "material question involving the sentence."[1] Consequently, we reject his argument that the "ends of justice" require consideration of his otherwise abusive *Gardner* claim.[16]

---

16. On appeal, Moore also challenges the district court's disposition of two additional claims. First, Moore asserts that the district court abused its discretion in concluding that he abused the writ by failing to include in his first federal petition his claim that he was denied effective assistance of trial counsel at the *sentencing* phase of his proceedings. An examination of the record in this case reveals that the

ineffectiveness issue, including the performance of counsel at the sentencing phase, was examined in detail by the trial court in its order denying the first state habeas petition. Moreover, Moore offers no proof that would excuse his neglect in failing to raise this claim in his first federal petition. Accordingly, we hold that the court did not abuse its discretion in finding

## III.

For the foregoing reasons, the district court's order dismissing Moore's second federal habeas petition as an abuse of the writ is AFFIRMED.

RONEY, Chief Judge, specially concurring:

I concur in the result reached by the in banc court, but for different reasons. The Supreme Court remanded this case for reconsideration under the principles set forth in *Teague v. Lane*, ― U.S. ―, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). I think the court should address the question posed by the Supreme Court on remand: How does the *Teague* decision affect the decision in this case? The court should answer this question even if it does then change the prior analysis of the abuse of the writ without regard to *Teague*.

The Supreme Court remand affords this Court the opportunity to determine if a *Teague* analysis would make it unnecessary to reach the abuse of the writ defense, or to consider how *Teague* might affect our abuse of the writ decision. We should make that determination. The decision not to reach *Teague* because of our abuse of the writ decision does not respond to the Supreme Court's remand.

*Teague* questions whether you would reach the merits of the issues asserted. As Judge Cox has pointed out, on a second petition alleging claims not previously asserted, the petition may be dismissed without resort to an abuse of the writ defense, if the records and pleadings show that the claim is without merit. *Sanders v. United States*, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963); *Stephens v. Kemp*, 721 F.2d 1300 (11th Cir.1983), *cert. denied*, 469 U.S. 1043, 105 S.Ct. 530, 83 L.Ed.2d 417 (1984). If under *Teague*, the merits of an issue would not be reached, the petition can be dismissed without getting to the abuse

of the writ defense. This is precisely the way the prior opinion of this court and the present opinion handle the discriminatory application of the death penalty argument.

Petitioner has sought the benefit of the Baldus study. The district court held it was barred on abuse grounds. We do not examine this in detail because the Baldus study was rejected in *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).

*Moore v. Kemp*, 824 F.2d 847, 857 (11th Cir.1987). *See* footnote 16 in Judge Cox's opinion.

Thus, on any second petition for habeas corpus relief, before reaching the abuse of the writ issue, a court could look at the new claims asserted in the light of *Teague*. The court would determine if the claim asserted would establish a new principle of law that has not been applied previously to the facts alleged, and if so, whether that principle falls into the category of procedural rules which under *Teague* would not be applied retroactively to all similarly situated defendants. If the rule would not be so applied, the petition should be dismissed without reaching the merits and without regard to whether there was in fact an abuse of the writ.

The in banc court should approach this remand in that way. I realize that *if* the court followed this analysis, and *if* it reached the same conclusion which I reach, it would not be necessary to revisit the abuse of the writ issue and might deprive the court of the opportunity to reject the reasoning of the prior in banc opinion. This could be dealt with as an alternative holding, however, as we often do when we are trying to decide all issues so that a reversal in part would not require reconsideration by the in banc court. If the court disagreed with my *Teague* analysis, then it would be within its authority to review and

that the claim was barred under abuse of the writ principles.

Second, Moore challenges the district court's rejection of his claim that the death penalty is applied in Georgia in a racially discriminatory manner. Moore's claim, which is based on the Baldus study, was not raised in Moore's first state or first federal habeas petitions. The dis-

trict court held that the claim was barred on abuse grounds. Pretermitting discussion of whether the claim was barred on grounds of either procedural default or abuse of the writ, we decline to examine this claim in detail because the Baldus study was rejected in *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).

change its prior decision as to the abuse of the writ standard. I would suggest that because this case has been pending so long, the court ought to try to wrap it all up in this decision.

Different judges will, of course, interpret *Teague* in different ways until the contours of that decision have been developed by the Supreme Court. It appears to me that *Teague* did two things: *first*, it instructed the courts on a new procedure as to the timing of a decision that a new constitutional principle will be applied retroactively. Heretofore, whether a decision is to apply retroactively to habeas corpus petitioners has been made after the principle has been announced in a habeas corpus case. Always the petitioner involved received the benefit of the rule, but it was left to a later case to determine whether it would be available to other defendants in a collateral attack on a final conviction. *Teague* holds that a court should first determine whether a new principle espoused by a habeas corpus petitioner would be applied to other habeas corpus petitioners. If it would not be so applied, then the court should not consider whether to adopt such a principle.

*Second,* the Court set forth the standard by which to judge which principles would be given retroactive effect to habeas corpus petitioners. Noting that the Court has made a distinction between direct review and collateral review for retroactivity of new principles, the Court adopted Justice Harlan's view of retroactivity for cases on collateral review.

> First, a new rule should be applied retroactively if it places "certain kinds of primary, private individual conduct beyond the power of criminal law-making authority to proscribe." *Mackey [v. U.S.]*, 401 U.S. [667], at 692 [91 S.Ct. 1160, 1180, 28 L.Ed.2d 404 1971] (separate opinion). Second, a new rule should be applied retroactively if it requires the observance of "those procedures that ... are 'implicit in the concept of ordered liberty.'" *Id.*, at 693, 91 S.Ct. at 1180 (quoting *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937) (Cardozo, J.)).

*Teague,* ––– U.S. at –––, 109 S.Ct. at 1073, 103 L.Ed.2d at 353.

In discussing the second exception to non-retroactivity, the one that is argued to be applicable here, the Court articulated various formulations of the kind of principle that would meet the standards of that exception.

> "[T]he Court never has defined the scope of the writ simply by reference to a perceived need to assure that an individual accused of crime is afforded a trial free of constitutional error." *Kuhlmann v. Wilson,* 477 U.S. 436, 447, 106 S.Ct. 2616, 2623, 91 L.Ed.2d 364 (1986) (plurality opinion).
>
> . . . .
>
> Application of constitutional rules not in existence at the time a conviction became final seriously undermines the principle of finality which is essential to the operation of our criminal justice system. Without finality, the criminal law is deprived of much of its deterrent effect.
>
> . . . .
>
> The "costs imposed upon the State[s] by retroactive application of new rules of constitutional law on habeas corpus ... generally far outweigh the benefits of this application." *[Solem v.] Stumes,* 465 U.S. [638], at 654 [104 S.Ct. 1338, 1347, 79 L.Ed.2d 579 1984] (Powell, J., concurring in judgment).
>
> . . . .
>
> The language used by Justice Harlan in *Mackey* leaves no doubt that he meant the second exception to be reserved for watershed rules of criminal procedure: "Typically, it should be the case that any conviction free from federal constitutional error at the time it became final, will be found, upon reflection, to have been fundamentally fair and conducted under those procedures essential to the substance of a full hearing. However, in some situations it might be that time and growth in social capacity, as well as judicial perceptions of what we can rightly demand of the adjudicatory process, will properly alter our understanding of the *bedrock procedural elements* that must be found to vitiate the fairness of a particular conviction. For example, such, in my view is the case with the right to

counsel at trial now held a necessary condition precedent to any conviction for a serious crime." 401 U.S. at 693–694, 91 S.Ct. at 1180–81 (emphasis added).

. . . .

In *Desist* [*v. U.S.*, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 1969], Justice Harlan had reasoned that one of the two principal functions of habeas corpus was "to assure that no man had been incarcerated under a procedure which creates an impermissibly large risk that the innocent will be convicted," and concluded "from this that all 'new' constitutional rules which significantly improve the pre-existing factfinding procedures are to be retroactively applied on habeas." 394 U.S. at 262, 89 S.Ct. at 1041.

. . . .

We believe it desirable to combine the accuracy element of the *Desist* version of the second exception with the *Mackey* requirement that the procedure at issue must implicate the fundamental fairness of the trial.

. . . .

. . . Finally, we believe that Justice Harlan's concerns about the difficulty in identifying both the existence and the value of accuracy-enhancing procedural rules can be addressed by limiting the scope of the second exception to those new procedures without which the likelihood of an accurate conviction is seriously diminished.

Because we operate from the premise that such procedure would be so central to an accurate determination of innocence or guilt, we believe it unlikely that many such components of basic due process have yet to emerge. We are also of the view that such rules are "best illustrated by recalling the classic grounds for the issuance of a writ of habeas corpus—that the proceeding was dominated by mob violence; that the prosecutor knowingly made use of perjured testimony; or that the conviction was based on a confession extorted from the defendant by brutal methods." *Rose v. Lundy,* 455 U.S. 509, 544, 102 S.Ct. 1198, 1217, 71 L.Ed.2d 379 (1982) (Stevens, J., dissent) (footnotes omitted).

. . . .

. . . Because the absence of a fair cross section on the jury venire does not undermine the fundamental fairness that must underlie a conviction or seriously diminish the likelihood of obtaining an accurate conviction, we conclude that a rule requiring that petit juries be composed of a fair cross section of the community would not be a "bedrock procedural element" that would be retroactively applied under the second exception we have articulated.

*Teague,* —— U.S. at ——, 109 S.Ct. at 1073–78, 103 L.Ed.2d at 354–359 (footnotes omitted).

It is within the parameters of this language that a court must judge whether a new principle, or an old principle applied in a new context, which for these purposes makes it a new principle, will be applied retroactively.

My examination in light of *Teague* of the claims made in this case convinces me that none of them would be extended retroactively to all defendants similarly situated to Moore.

The first claim is that the state failed to advise Moore of his right to remain silent or of his right to counsel prior to or during a presentence interview conducted by a probation officer after conviction and before sentencing, a claim based on *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). *Estelle* held that the admission of a psychiatrist's testimony at the death penalty sentencing proceeding violated the defendant's privilege against compelled self-incrimination because the defendant was not advised before the examination that he had the right to remain silent and that any statement he made could be used against him.

Petitioner would have us extend that right to the post-conviction interview by a probation officer. The question is not whether the right against self-incrimination is fundamental, but whether the application of *Miranda* to a probation officer's interview is of the bedrock character, such a fundamental procedure "without which the likelihood of an accurate conviction (sentence) is seriously diminished." *Teague,*

—— U.S. at ——, 109 S.Ct. at 1077, 103 L.Ed.2d at 358.

The principle espoused by Moore, although it might be appropriate, is not of the fundamental or bedrock character required by *Teague* in order for it to be applied to all defendants in a habeas attack upon their conviction. I would, therefore, affirm the denial of the petition asserting this claim for relief on the ground that the principle could not be applied to Moore.

The second claim is that Moore was denied the right to confront and cross-examine witnesses whose hearsay testimony was considered in the presentence report, based on our case of *Proffitt v. Wainwright*, 685 F.2d 1227 (11th Cir.1982), *cert. denied*, 464 U.S. 1002, 104 S.Ct. 508, 78 L.Ed.2d 697 (1983). A reading of the *Proffitt* opinion itself would seem to refute the notion that the principle there announced is a "bedrock procedural element". In a thorough discussion of sentencing procedures, the opinion notes that "courts have declined to apply to sentencing most of the procedural rights guaranteed by the sixth amendment." 685 F.2d at 1252. The court then states that because the death penalty is different, capital sentencing procedures "bring into play constitutional limitations not present in other sentencing decisions." *Id.* at 1253. The holding of the court itself leaves room for the denial of the right in some situations: " .... the right to cross-examine adverse witnesses applies to capital sentencing proceedings, *at least where necessary to ensure the reliability of the witnesses' testimony.*" *Id.* at 1255 (emphasis added).

We need not now decide whether it would have been inappropriate to announce the principle in *Proffitt* in a habeas corpus proceeding, had *Teague* been the law at that time. It is appropriate now, however, when the claim is that Moore should have been able to cross-examine *all* witnesses whose hearsay statements appeared in the presentence report, to determine whether this extension of *Proffitt* should be made retroactive.

If the principle of *Proffitt* is so bedrock and fundamental, why would it not be extended to *all* criminal defendants? Why would not the right of cross-examination apply to all witnesses, without qualification? If this court is to follow the language of *Teague* and the obvious intendment of words in that opinion, we would deny the retroactive application of the principle which Moore wants us to establish in his case, absent some further guidance from the Supreme Court.

The third claim alleges that neither Moore nor his counsel was afforded adequate opportunity to review the presentence report prior to the sentencing proceeding in violation of *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). This does not fit into the *Teague* analysis, because it does not ask us to adopt a new principle of law or apply an old principle of law to a new fact situation, which should be treated as new law. "[T]his is not a claim based on alleged 'new law' declared since the first federal petition." *Moore*, 824 F.2d at 855. *Teague* only applies to "new law" situations.

> [H]abeas corpus cannot be used as a vehicle to create new constitutional rules of criminal procedures unless those rules would be retroactively applied to *all* defendants on collateral review.

*Teague*, —— U.S. at ——, 109 S.Ct. at 1078, 103 L.Ed.2d at 360. The word "new" is at the center of the *Teague* analysis.

As to this *Gardner* issue, in the prior opinion of the in banc court, we said that

> We cannot say that the district court, in ruling on Moore's second petition, erred in finding that the failure to include this claim in the first petition was an abuse of the writ.

*Moore*, 824 F.2d at 856. I agree with that decision.

The court then vacated the denial of the *Gardner* claim for fresh consideration under the "ends of justice" principle. In my judgment, that decision was based on the fact that the case was going back to the district court anyway, and not on any notion that the defendant would be entitled to any relief on that issue alone. I cannot fault the way this court now handles the issue. There being an abuse of the writ, I would affirm the district court's decision on this point.

On appeal, Moore also challenged the district court's disposition of his claim that his counsel rendered ineffective assistance at the sentencing phase of his trial and that the Georgia death penalty was applied in a racially discriminatory manner. I agree with the treatment of these issues in footnote 16 of the majority opinion, which is the same resolution reached by the prior in banc panel. *Moore*, 824 F.2d at 857.

For these reasons, I agree that the judgment of the district court should be affirmed.

HILL, Circuit Judge, concurring:

I agree with what Chief Judge Roney has written. His approach—to determine under *Teague v. Lane*, — U.S. —, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) whether the petitioner's asserted constitutional errors would be applicable to the case before undertaking an abuse of the writ analysis—is clearly the better approach in this case, remanded to us by the Supreme Court for our reconsideration in the light of *Teague*. I come to no firm conclusion as to whether, in all cases, the *Teague* analysis should be a precedent to deciding whether or not the petition constitutes an abuse of the writ.

The opinion by Judge Cox is the proper opinion for those who think that the abuse of the writ issue is to be reached. It is not improper for each active judge on an en banc court to face and resolve the issues before the court. If a judge now on this court considers and decides an issue to a result different from the result that had theretofore been reached by an earlier member of the court, the judge should vote his conviction. It would be wrong for a judge to refuse to grant habeas corpus relief to a death penalty petitioner merely because the court had on an earlier, now vacated, occasion denied relief and the new judge wished to avoid being tagged as whimsical. It would be just as wrong for the judge to fail to vote his or her conviction should that vote be to deny relief.

As stated, I concur in what Chief Judge Roney has written and thus do not reach the abuse of the writ issue. I see no reason to believe that, were I to reach the issue, the views expressed in my earlier dissent would be changed. *Moore v. Kemp*, 824 F. 2d 847, 877 (11th Cir.1987), Hill, J., dissenting.

J.L. EDMONDSON, Circuit Judge, concurring:

I concur in the result Judge Cox has reached. On the question of abuse of the writ generally, Judge Cox's opinion seems to be consistent with my view as set out in *Gunn v. Newsome*, 881 F.2d 949, 969 (11th Cir.1989) (Edmondson, J., dissenting). For that reason, I also concur in his opinion.

KRAVITCH, Circuit Judge, dissenting:

The Supreme Court has remanded this case to us "for further consideration in light of *Teague v. Lane*, 489 U.S. —, [109 S.Ct. 1060, 103 L.Ed.2d 334] (1989)." Yet the Cox plurality opinion[1] effectively ignores *Teague*. I believe that it is our duty to follow the Supreme Court's remand order and consider *Teague*, that it is improper for us to revisit issues that we previously resolved en banc, and that our prior en banc determination in this case was correct. Accordingly, I dissent.

Because Judge Johnson has written a dissent detailing the effect of *Teague* on Moore's petition, I will not repeat what he has already said. I join in parts I, II–B, II–C–1, II–C–2, III–A, III–C, and IV of Judge Johnson's dissent. I write separately because I disagree with his analysis of certain issues.

### I.

### OUR ROLE ON REMAND

Two years ago this court, sitting en banc, concluded that Moore's failure to assert his *Estelle* and *Proffitt* claims in his first federal habeas petition was not an abuse of the writ. The en banc court also directed the district court to determine whether the ends of justice required the court to consider Moore's *Gardner* claim. Now, Judge Cox, apparently believing that he is writing

---

1. Written by Judge Cox and joined by Judges Tjoflat, Fay, Vance and Edmondson.

on a clean slate, simply concludes that our prior decision was wrong. Yet the facts have not changed in the interim, nor has the relevant law.

The plurality clutches at the fact that the Supreme Court vacated our prior opinion and remanded the case for our reconsideration in light of *Teague*. The only way for the Court to have us consider the unique way *Teague* interacts with the abuse of the writ doctrine, however, was by vacating our prior opinion. We should draw no inference from a remand order, one way or the other, as to the Court's view of the correctness of our prior en banc opinion.[2] We should, however, interpret the remand order as meaning what it says: our task on remand is to reconsider our prior decision in light of *Teague*, that is, whether *Teague* affected our earlier opinion. We show no greater fealty to the Supreme Court than when we construe the Court to mean what it says, but the plurality has chosen a different path.

Of course, we have the power to revisit any issue determined by the prior en banc court. In my view, however, we should not exercise that power, particularly in this case, where doing so flouts the plain meaning of the Supreme Court's remand order.

Courts have long recognized that principles of finality, fairness, and efficiency counsel against redetermining issues that have already been decided by the same court. Under the rubric "law of the case," these principles give rise to the rule that once a court has decided an issue in a case, that issue remains settled unless or until it

is reversed or modified by a higher court. Unaware of the irony, the Cox opinion ignores such principles of finality, while purporting to vindicate those same principles. *See, e.g., ante,* at 1504.

## II.

### APPLYING *TEAGUE* TO MOORE'S PETITION

#### A.

The Georgia Supreme Court affirmed Moore's conviction in 1975. When the Supreme Court denied Moore's petition for certiorari on October 4, 1976 his conviction became "final" for the purposes of our analysis under *Teague*.[3] *Cf. Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 712 n. 6, 93 L.Ed.2d 649 (1987) ("By 'final,' we mean a case in which judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied.").

Having ascertained the date Moore's conviction became final, the next step is to determine whether a claim he is raising is a "new rule" claim, i.e., a claim in which he seeks the benefit of a rule announced after his conviction became final.[4] If a claim is one seeking the benefit of a "new rule," then under *Teague* the federal habeas court may not entertain the claim unless the rule fits into one of two exceptions.[5] *See Penry v. Lynaugh,* —— U.S. ——, 109 S.Ct. 2934, 2944, 106 L.Ed.2d 256 (1989).

---

**2.** The Cox opinion suggests that simply applying *Teague* to our prior opinion must implicitly rest on the belief that the Supreme Court has approved of our prior determination. The remand order does not constitute an implicit approval of our prior opinion. Nor does it constitute implicit disapproval or constitute a direction to "go back and do whatever you want." The remand order means what it says, no more, no less: "reconsider your prior opinion in light of *Teague*."

**3.** In *Penry v. Lynaugh,* —— U.S. ——, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), the Supreme Court applied *Teague* to a capital case, settling a question that *Teague* itself had not resolved: the nonretroactivity principles of *Teague* apply to capital cases.

**4.** By contrast, a "new law" claim in the abuse of the writ context means a claim seeking the

benefit of a rule announced after the petitioner filed a prior habeas petition.

**5.** Judge Johnson suggests that *Teague* and the principles of nonretroactivity are an affirmative defense that may be waived. I disagree. Permitting a state to waive *Teague* in some cases and not in others would create the very unfairness and disparate treatment of similarly situated petitioners that *Teague* sought to prevent. I believe that a federal habeas court must conduct an analysis of whether *Teague* applies as a threshold matter, before reaching, for example, the abuse of the writ. *See Penry v. Lynaugh,* —— U.S. ——, 109 S.Ct. 2934, 2944, 106 L.Ed.2d 256 (1989) ("Penry is currently before the Court on his petition in federal court for a writ of habeas corpus. Because Penry is before us on collateral review, we must determine, as a threshold matter, whether granting him the relief he seeks

I agree with Judge Johnson that Moore's *Proffitt* and *Gardner* claims are "new" for retroactivity purposes. I also agree that under *Battie v. Estelle*, 655 F.2d 692 (5th Cir.1981), Moore's *Estelle v. Smith* claim is not "new" for retroactivity purposes. Therefore, we may entertain the *Proffitt* and *Gardner* claims only if they fall into one of the two exceptions outlined in *Teague*. On the other hand, *Teague* does not affect the *Estelle v. Smith* claim at all.

I disagree with Judge Johnson's suggestion that because a claim is not "new law" for retroactivity purposes it may not be "new law" for purposes of the abuse of the writ, or vice versa.[6] Thus, I do not perceive any tension between our decision in *Battie* holding that *Estelle v. Smith* is not new law for retroactivity purposes and our prior en banc ruling that the *Estelle v. Smith* claim was a new law claim for abuse of the purposes.

I will not rush in where the Supreme Court has hesitated to tread and try to define what is "new law" for either retroactivity or abuse of the writ purposes.[7] For this dissent it will suffice simply to note that the equitable principles underlying the abuse of the writ properly focus on the petitioner's conduct, or that of his counsel if he was not travelling pro se. *See generally Gunn v. Newsome*, 881 F.2d at 957–96 (11th Cir.1989) (en banc). By contrast, the conduct of the habeas petitioner or his attorney is irrelevant to determining whether a rule of law is new for retroactivity purposes. The retroactivity analysis focuses solely on the relationship of the new rule to prior law:

> In general, however, a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government. To put it differently, a case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final.

*Teague*, 109 S.Ct. at 1070 (citations omitted) (plurality opinion). We should not conflate the questions of whether a rule is new for nonretroactivity purposes as opposed to abuse of the writ purposes.

### B.

Because both the *Gardner* and *Proffitt* claims are new for retroactivity purposes, the next step is to determine whether the claims fit into either of the two exceptions presented in *Teague*.[8]

The first exception for new rules that will be applied retroactively is where the new rule places "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe." *Teague*, 109 S.Ct. at 1075 (citation omitted) (plurality opinion). This exception is plainly not applicable to either the *Proffitt* or *Gardner* claim.

The second exception to *Teague*'s general rule that a new rule will not be applied retroactively on collateral review encompasses fundamental rules "without which the likelihood of an accurate conviction is seriously diminished." *Teague*, 109 S.Ct. at 1076–77 (plurality opinion).[9]

---

would create a 'new rule.' *Teague v. Lane*, 489 U.S. ——, ——, 109 S.Ct. 1060, ——, 103 L.Ed.2d 334 (1989). Under *Teague*, new rules will not be applied or announced in cases on collateral review unless they fall into one of two exceptions. *Id.* at ——, 109 S.Ct. at ——.").

6. I also disagree with Judge Johnson's reading of the Supreme Court's remand as a suggestion "that only decisions which are new law for retroactivity purposes may excuse a successive petition."

7. *See, e.g., Teague*, 109 S.Ct. at 1070 ("It is admittedly often difficult to determine when a case announces a new rule, and we do not attempt to define the spectrum of what may or may not constitute a new rule for retroactivity purposes.") (plurality opinion).

8. The *Estelle v. Smith* claim drops out of my *Teague* analysis because it is not new law for retroactivity purposes, therefore *Teague* is not implicated.

9. Justice Harlan explained why a fundamental rule should be applied retroactively in *Mackey v. United States*:

> [I]n some situations it might be that time and growth in social capacity, as well as judicial perceptions of what we can rightly demand of the adjudicatory process, will properly alter our understanding of the bedrock procedural elements that must be found to vitiate the fairness of a particular conviction. For example, such, in my view is the case with the right to counsel at trial now held a necessary condition precedent to any conviction for a serious crime.

I agree with Judge Johnson that both the *Gardner* and *Proffitt* claims fit within the terms of this second exception. Both are based on the right of confrontation, and our adversarial system—unlike the inquisitorial method—depends above all else upon the right of confrontation to arrive at an accurate result.

## III.

### ABUSE OF THE WRIT

Because the *Gardner* and *Proffitt* claims may be applied retroactively on petitions for collateral relief, as a threshold matter these claims are available to Moore. Because the *Estelle v. Smith* claim is not "new" for retroactivity purposes, *Teague* does not come into play, and that claim is also, as a threshold matter, available to Moore. The next step is to determine whether Moore has abused the writ, and thus disentitled himself from presenting these claims through the equitable remedy of the writ of habeas corpus. *See, e.g., Sanders v. United States,* 373 U.S. 1, 17, 83 S.Ct. 1068, 1078, 10 L.Ed.2d 148 (1963); *Gunn v. Newsome,* 881 F.2d at 954–56.

I agree with Judge Johnson that Moore did not abuse the writ in failing to raise the *Proffitt* claim. While Judge Johnson suggests that the Supreme Court's discussion of new law for retroactivity purposes implicates our prior en banc determination that Moore had not abused the writ with respect

to his *Estelle v. Smith* claim, I do not. In my view the prior en banc court was correct and *Teague* does not affect that determination.[10]

I also agree with Judge Johnson that the district court should consider whether the ends of justice call for the court to entertain Moore's *Gardner* claim. As the prior en banc court made clear, Moore's *Gardner* claim does indeed have merit. Moore has raised a genuine factual dispute as to whether and when his counsel received the presentence investigation report, a report which *indisputably* contained many inaccuracies.

In finding the *Gardner* claim without merit, the majority reasons that because a defendant may be sentenced to death with only one aggravating circumstance, e.g., committing the murder during the commission of a felony, Moore must challenge that very aggravating circumstance for the ends of justice to apply. I emphatically disagree with this suggestion. The court that imposed the death penalty on Moore had an inaccurate presentence investigation report. The very purpose of this report is to enable the sentencing court to make a reasoned and informed decision on whether to impose that most final of penalties. The choice to impose the death penalty based on *all* the available and *accurate* information is the state's. Does the majority really believe that the state court would not be

*Mackey,* 401 U.S. 667, 693–94, 91 S.Ct. 1160, 1180, 28 L.Ed.2d 404 (1971) (separate opinion) (quoted in *Teague,* 109 S.Ct. at 1075–76 (plurality opinion)).

A rule must implicate the accuracy of a conviction in order to meet this second exception to *Teague*'s rule of nonretroactivity because one of the main purposes of the writ of habeas corpus is, as Justice Harlan noted in *Desist,* "to assure that no man has been incarcerated under a procedure which creates an impermissibly large risk that the innocent will be convicted." Thus "all 'new' constitutional rules which significantly improve the pre-existing factfinding procedures are to be retroactively applied on habeas." *Desist v. United States,* 394 U.S. 244, 262, 89 S.Ct. 1030, 1041, 22 L.Ed.2d 248 (1969) (Harlan, J., dissenting) (quoted in *Teague,* 109 S.Ct. at 1076 (plurality opinion)).

The *Teague* plurality fashioned the second exception by combining these two concerns, and "limiting the scope of the second exception to those new [fundamental] procedures without

which the likelihood of an accurate conviction is seriously diminished." *Teague,* 109 S.Ct. at 1076 (plurality opinion). Justice Stevens, however, while concurring in the use of Harlan's analytic framework, disagreed with the plurality's modification of the second exception, and adhered to Harlan's own view rejecting the linkage of fundamental fairness to factual innocence. In addition, Stevens noted that "a touchstone of factual innocence would provide little guidance in certain important types of cases, such as those challenging the constitutionality of capital sentencing hearings." *Teague,* 109 S.Ct. at 1080–81 (Stevens, J., joined by Blackmun, J., concurring in part) (footnote omitted).

10. Although Chief Judge Roney and Judge Hill agree that the court first should have applied *Teague* to the issues presented before considering abuse of the writ, they do not agree with the five dissenting judges' conclusion that *Teague* does not bar Moore's claims.

justified in imposing a penalty of less than death once the inaccuracies of the presentence investigation report were brought to the state's attention? I find it an intrusion into the proper role of the state courts for a federal court to step in and declare that the state must impose the death penalty unless Moore challenges all applicable aggravating circumstances, and I know of no authority to support such an unprecedented rule. The ends of justice should require the district court to reach the merits of Moore's *Gardner* claim.

## IV.

## CONCLUSION

The abuse of the writ issue decided by the court today was decided before by this court en banc; it was, however, decided the other way. This reversal of our previous decision is, at best, unseemly as there has been no intervening factual or legal development to explain or excuse reconsideration of the abuse of the writ issue. The Supreme Court vacated our prior en banc decision for reconsideration in light of *Teague*. It did not give us carte blanche to reexamine the entire case.

Five years ago I dissented from the original panel that affirmed the district court's determination that Moore had abused the writ. Two years ago I joined the majority opinion of the en banc court explaining why Moore had not abused the writ. Even if I did not dissent from the result reached by the majority today, I would like to think that I would dissent from the decision to revisit our prior en banc opinion and to ignore the Supreme Court's remand order. Accordingly, I once again dissent.

JOHNSON, Circuit Judge, dissenting, in which HATCHETT, Circuit Judge joins and KRAVITCH, ANDERSON and CLARK, Circuit Judges, join in part:

Because this Court[1] ignores the Supreme Court's mandate and rules contrary to its previous decision without rebriefing or reargument of the issues it decides, I must dissent.

### I. THE PURPOSE OF THE *EN BANC* REHEARING

On July 27, 1987, this Court issued its *en banc* opinion reversing the district court's dismissal on abuse of the writ grounds of all claims brought by Moore in his second habeas petition. *See Moore v. Kemp*, 824 F.2d 847 (11th Cir.1987) ("1987 opinion"). The Court held that Moore's claims brought under *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), and *Proffitt v. Wainwright*, 685 F.2d 1227 (11th Cir.1982), *reh'g denied as modified*, 706 F.2d 311 (11th Cir.1983), *cert. denied*, 464 U.S. 1003, 104 S.Ct. 509, 78 L.Ed.2d 698 (1983), should not have been dismissed because they were based on law unavailable to Moore at the time of his first petition. *See* Rule 9(b) Governing Section 2254 cases, 28 U.S.C.A. Foll. § 2254. It also held that because a third claim, brought under *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), called into question the accuracy of the facts underlying Moore's sentence, it merited further consideration on "ends of justice" grounds. *Cf. Smith v. Murray*, 477 U.S. 527, 538, 106 S.Ct. 2661, 2668, 91 L.Ed.2d 434 (1986). The Court then remanded Moore's three claims to the district court. The state petitioned the Supreme Court for a writ of certiorari. On March 29, 1989, the Supreme Court vacated this Court's

---

1. No single opinion commands a majority of the Court in this case. *See* plurality opinion of Cox, J.; concurring opinion of Roney, C.J. In discussing the reasoning of today's decision, I will primarily address the plurality opinion. Chief Judge Roney's special concurrence does respond to the Supreme Court's mandate, and addresses some of the issues I discuss below, although, for reasons discussed below, I do not agree with his conclusions. However, Chief Judge Roney's concurrence also accedes in, and thus effectively joins, the plurality's conclusions, reached in flagrant disregard of the Supreme Court's mandate, on the abuse of the writ issues. *See* concurring opinion of Roney, C.J., at 1517. Thus, while I refer to "the plurality" in discussing specific aspects of the plurality's reasoning, I also refer generally to "the Court" and "the majority" in discussing generally the Court's holding in this case.

decision and remanded it for reconsideration in light of *Teague v. Lane*, —— U.S. ——, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). *See Zant v. Moore*, —— U.S. ——, 109 S.Ct. 1518, 103 L.Ed.2d 922 (1989).

In the intervening time, decisions in this circuit, *see, e.g., Tafero v. Dugger*, 873 F.2d 249, 251 (11th Cir.1989); *Gunn v. Newsome*, 851 F.2d 1294, 1296 (11th Cir.1988), *aff'd on reh'g*, 881 F.2d 949 (11th Cir.1989); *Ritter v. Thigpen*, 828 F.2d 662, 665 (11th Cir.1987); *Mitchell v. Kemp*, 827 F.2d 1433, 1435 (11th Cir.), *cert. denied*, 483 U.S. 1050, 108 S.Ct. 14, 97 L.Ed.2d 812 (1987); *Daugherty v. Dugger*, 699 F.Supp. 1517, 1520 n. 2 (M.D.Fla.1988), and in other circuits, *see, e.g., Hannon v. Maschner*, 845 F.2d 1553, 1557 (10th Cir.1988); *Mercer v. Armontrout*, 701 F.Supp. 1460, 1465 (W.D. Mo.1988), *appeal dismissed*, 864 F.2d 1429 (8th Cir.1988), have been rendered with *Moore* as their guide. In addition, numerous unpublished decisions from this Court's special docket of capital cases have relied on *Moore*'s formulation of abuse of the writ principles to grant and deny stays of execution.

Today, this Court rules without explanation that its 1987 decision in *Moore* is a meaningless sport in the law. Neither Congress, nor the Supreme Court, nor this Court have altered the standards used to judge abuse of the writ claims since this Court's 1987 opinion. No new facts have been put before this Court since its 1987 opinion issued. Petitioner is, in fact, in precisely the same position before this Court today as he was at the time of the 1987 opinion. Moreover, the merits of this Court's 1987 opinion have not been re-briefed or reargued.[2] No principled reason exists for the 1989 version of the Eleventh Circuit to rule differently from the 1987 version of this Court. The majority's action in this case exhibits the sort of "arbitrary discretion" in disregarding prior decisions against which the Supreme Court has recently warned. *See Patterson v. McLean Credit Union*, —— U.S. ——, 109 S.Ct. 2363, 2370, 105 L.Ed.2d 132 (1989) (quoting *The Federalist* No. 78, at 490 (A. Hamilton) (H. Lodge ed. 1888)). Adherence to past decisions "ensure[s] that the law will not merely change erratically, but will develop in a principled and intelligible fashion. That doctrine permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals...." *Vasquez v. Hillery*, 474 U.S. 254, 265, 106 S.Ct. 617, 624, 88 L.Ed.2d 598 (1986).

The fact that *stare decisis* is technically inapplicable to this case provides little solace to those members of the public and the bar who expect the law to encompass more "than the proclivities of individuals." The approach of the plurality opinion in this case might be somewhat legitimate if it were announcing a new rule of law. *Moore*'s claims would then seem to be dismissed by operation of law rather than by whim. However, the plurality applies the *same* law as did this Court in 1987—yet with a completely different result.[3] By operation of no principle of which I am aware can this Court reach a result contrary to that which it reached under identical law and facts two years ago. Surely this constitutes the sort of "arbitrary discretion" condemned by *Patterson*.

---

**2.** As might be expected, given the Supreme Court's mandate, the parties below argued the meaning and application of *Teague v. Lane*. They were not asked to rebrief or reargue the abuse of the writ issues this Court redecides today. Presumably, the plurality's conclusions are based on briefs now more than five years old and the dim recollection (of those members of the Court who were there) of an oral argument which took place the same length of time ago.

**3.** The plurality purports to "adopt" a new rule. *See* at 1506; *id.* at 1505 ("Our task in this case is definitively to decide the standard by which courts of this circuit henceforth will judge the abusive nature of petitions alleging 'new law' claims.") It applies an objective standard which "seeks to ascertain if reasonably competent counsel, at the time of filing of the first petition, reasonably should have anticipated a later change in the law." *Id.* at 1506. *This is precisely the same objective standard applied by this Court in its 1987 opinion. See* 824 F.2d at 851 ("[Moore] is chargeable with ... the knowledge that would have been possessed by reasonably competent counsel at the time of the first petition.... [R]easonably competent counsel ... could not reasonably have been expected to foresee [Moore's *Estelle v. Smith* claim]"); *id.* at 852 (standard is what "counsel reasonably should have foreseen").

The plurality's failure to follow our earlier decision is even more unprincipled in view of the fact that this case was not remanded "in light of" a Supreme Court decision involving abuse of the writ. Obviously, this Court would have to conform itself to new Supreme Court precedent. However, *Teague v. Lane* is not a case involving abuse of the writ, as the plurality recognizes. Instead of "reconsider[ing] its opinion in light of *Teague v. Lane,*" the plurality ignores that portion of the Supreme Court's mandate as surplusage. The Court's remand in light of *Teague* is not meaningless. I would reaffirm this Court's 1987 opinion and apply *Teague* to this case as I believe was contemplated by the Supreme Court's order. Because application of *Teague* does not necessarily result in the dismissal of Moore's petition, I set forth what I believe to be the proper disposition of the case.

## II. THE APPLICATION OF *TEAGUE*

*Teague* establishes a bright-line rule for when a judicial decision creating "new law" will be applied retroactively in criminal cases. Defendants who have not yet completed the direct appeal process at the time of the announcement of a new rule will receive its benefit; defendants whose convictions are final will not. The decision provides two exceptions, one of which is applicable to this case. A rule will be applied retroactively to *all* defendants, on direct appeal or in collateral proceedings, if it concerns "bedrock procedural elements" which enhance the accuracy of the trial court's decision. *See* 109 S.Ct. at 1076–77.

The logic of the remand becomes clear when the procedural posture of this habeas case is examined. Because this is Moore's second petition, he must first jump the Rule 9(b) hurdle. This Court's 1987 opinion

determined that Moore's three claims were not barred as abuse of the writ, even though this is Moore's second petition. This Court's remand to the district court for consideration of Moore's claims may have been premature because the retroactivity of the cases on which Moore relied had not yet been addressed. Moore is entitled to full consideration on the merits only if the cases on which he relies have retroactive application. *See Fleming v. Kemp,* 837 F.2d 940, 947 (11th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1764, 104 L.Ed.2d 200 (1989); *see also* Advisory Committee Note Rule 9(b) ("[a] retroactive change in the law" may excuse "failure to assert a ground in a prior petition"). The Supreme Court's action allows this Court to address that threshold question.[4]

### A. *Waiver*

At no time in these proceedings has the state claimed that the decisions relied upon by Moore should not be applied retroactively to his sentencing in 1974. Moore argues that the state has therefore waived the opportunity to raise the defense of non-retroactivity. *See Zant v. Moore,* —— U.S. ——, 109 S.Ct. 1518, 1519, 103 L.Ed.2d 922 (1989) (Blackmun, J., dissenting) ("petitioner did not raise non-retroactivity as a defense to respondent's claim for federal habeas relief, and that defense therefore should be deemed waived"). It appears that non-retroactivity is an affirmative defense. *See United States v. Francischine,* 512 F.2d 827, 830 (5th Cir.), *cert. denied,* 423 U.S. 931, 96 S.Ct. 284, 46 L.Ed.2d 261 (1975) ("the court should not have considered the retroactivity of *United States v. Maze* [414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974)] ... [t]he issue was not properly before the court as a defense to

---

4. The Supreme Court's order also necessitates inquiry into one of this Court's holdings on the initial question of abuse of the writ. This Court's 1987 opinion held that *Estelle v. Smith* was an unforeseeable change in the law which excused Moore's failure to raise his claim in his prior petition. 824 F.2d at 853–54 & n. 12. However, this Court previously held in the retroactivity context that *Estelle v. Smith* did *not* announce a new principle of law. *See Battie v. Estelle,* 655 F.2d 692, 697–99 (5th Cir.1981).

The remand gives this Court the opportunity to consider whether a decision which is not "new law" for purposes of retroactivity may be deemed unforeseeable for purposes of excusing abuse of the writ. In other words, the remand may ask this Court to consider the adoption of a rule that any change in the law significant enough to excuse abuse of the writ must also constitute a "new rule" for purposes of retroactivity. I discuss this issue below in Part II(C)(3).

the petition for revocation of probation"). In the habeas context, the defense of non-retroactivity has been available since at least *Linkletter v. Walker,* 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965) (establishing standard for determining propriety of retroactive application of new law). Although *Teague* expressly modifies the *Linkletter* test in a manner which disadvantages collateral litigants, it does not create a new defense which was previously unavailable to the state.

However, the state argues quite persuasively that it has not waived the defense because the proper time to raise it has not arrived. In Moore's case, the state pleaded abuse of the writ in immediate response to Moore's petition. That shifted the burden to Moore to prove that his successive petition was not abusive. *See generally Ritter v. Thigpen,* 828 F.2d 662 (11th Cir.1987). Only the preliminary issue of abuse of the writ has been litigated thus far. The state claims that there has been no need to raise any defenses on the merits, *i.e.,* non-retroactivity, until the abuse issue is settled. Although no case directly addresses this issue, I assume *arguendo* that the state has not waived the defense.

### B. *The Applicability of Teague to Capital Cases*

Raising another issue which would pretermit the application of *Teague* to his claims, Moore argues that *Teague* should not be applied at all in the capital sentencing context. The Supreme Court has rejected this argument. *See Penry v. Lynaugh,* ─ U.S. ─, 109 S.Ct. 2934, 2944, 106 L.Ed.2d 256 (1989) (applying *Teague* to capital cases). However, in doing so the

Court held that the exceptions to *Teague* apply in the capital context. *Id.* Only if the *Teague* exceptions are applied fairly to permit retroactive application of procedural rules which enhance the accuracy of sentences will the application of *Teague* to Moore's claims pass constitutional muster.[5]

### C. *The Teague Exceptions and Moore's Claims*

Because *Teague* is applicable to Moore's claims, this Court should tackle the question of the retroactivity of the cases relied upon by Moore. I believe *Teague* would properly be applied in the following manner:

#### 1. *Gardner*

The Supreme Court, in *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), held that capital defendants must have access to and an opportunity to explain or deny information which the state considers in sentencing.[6] *Teague* provides for retroactive application of "accuracy-enhancing procedural rules" which implicate the "bedrock procedural elements" of a criminal conviction. *Id.,* 109 S.Ct. at 1076. The principle enunciated in *Gardner* is clearly such a rule. This rule is meant to provide for better fact-finding through adversarial procedure. *Gardner* allows crucial information to be clarified and supplemented. The result is that the sentencer has an improved and more accurate view of the facts upon which the sentence should be based. *Id.* at 359, 97 S.Ct. at 1205 (scrutiny of evidence to be presented during the sentencing phase minimizes "[t]he risk that some of the information accepted

---

**5.** *Teague* provides for retroactive application of new procedural rules "without which the likelihood of an accurate conviction is seriously diminished." *Id.,* 109 S.Ct. at 1076–77. If this language is applied to the accuracy of a *sentence,* then most important decisions in the capital sentencing context should be given retroactive effect. *See, e.g., Hitchcock v. Dugger,* 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987) (accuracy of death sentence undermined by limitations on consideration of non-statutory mitigating factors); *Gardner, supra,* (accuracy of death sentence undermined by sentencer's consideration of information unavailable to defendant); *Johnson v. Mississippi,* 486 U.S. 578,

108 S.Ct. 1981, 100 L.Ed.2d 575 (1988) (accuracy of death sentence undermined by consideration of uncounseled prior felony convictions).

**6.** I assume that *Gardner* represents new law for retroactivity purposes. *See Penry,* 109 S.Ct. at 2944 ("a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government") (quoting *Teague,* 109 S.Ct. at 1070). *Gardner's* requirements of access and opportunity to explain or deny information previously withheld from capital defendants undoubtedly imposed a "new obligation on the States."

in confidence may be erroneous, or may be misinterpreted, by the investigator or by the sentencing judge"). Under *Teague,* then, Moore is entitled to retroactive application of *Gardner.*[7]

### 2. *Proffitt*

Moore is similarly entitled to retroactive application of *Proffitt v. Wainwright,* 685 F.2d 1227 (11th Cir.1982), *reh'g denied as modified,* 706 F.2d 311 (11th Cir.1983), *cert. denied,* 464 U.S. 1003, 104 S.Ct. 509, 78 L.Ed.2d 698 (1983).[8] This Court in *Proffitt* held that a capital defendant had the right to confront psychiatric witnesses at his sentencing hearing. This right has its foundations in "assur[ing] the 'accuracy of the truth-determining process.'" *Chambers v. Mississippi,* 410 U.S. 284, 295, 93 S.Ct. 1038, 1046, 35 L.Ed.2d 297 (1973) (citations omitted) (cited in *Proffitt,* 685 F.2d at 1254). The idea that cross-examination improves the accuracy of fact-finding is at the foundation of the American adversarial system. *See Proffitt,* 685 F.2d at 1251 ("Cross-examination has been placed on a par with the right to notice and an opportunity to be heard and the right to counsel, which are fundamental minimum requirements of a fair trial comporting with the due process clause."). The right to cross-examination created in *Proffitt* is expressly based on improving the quality of information available and the "reliability of fact-finding." 685 F.2d at 1253. *See also Chambers v. Mississippi,* 410 U.S. at 295, 93 S.Ct. at 1046 (denial of cross-examina-

tion "calls into question the ultimate 'integrity of the fact-finding process'") (citations omitted). The procedural right set forth in *Proffitt* is perhaps the paradigm example of the accuracy-enhancing exception set forth in *Teague.* There can be no doubt that *Proffitt* applies retroactively.

### 3. *Smith*

Moore's claim based on *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), presents a problem that his other two claims do not. *Smith* is not "new law" for retroactivity purposes. *See Battie v. Estelle,* 655 F.2d 692, 696–97 (5th Cir.1981). Yet this Court held in its 1987 opinion that *Smith* was new law for the purpose of excusing his failure to raise it in his prior petition. *Moore,* 824 F.2d at 853–54 & n. 12. The interrelatedness and possible identity of these two conceptions of "new law" is what this Court should have addressed on remand. Although I hesitate to discuss the issue in the vacuum of a dissent, I think the problem should at least be presented.

Moore asks the Court to maintain the position taken in our 1987 opinion that a decision which is not new law for retroactivity purposes may constitute an unforeseeable change in the law that excuses a successive petition from being dismissed as abusive.[9] *See Moore,* 824 F.2d at 853 n. 12. This Court in its 1987 opinion cited only *Alvord v. Wainwright,* 725 F.2d 1282 (11th Cir.), *cert. denied,* 469 U.S. 956, 105 S.Ct.

---

**7.** Moore's first federal habeas petition was filed in November 1978, more than a year after *Gardner* was decided. Moore's belated *Gardner* claim was excused by this Court's 1987 opinion in its Rule 9(b) analysis in order to further the "ends of justice," not because *Gardner* was unforeseen "new law" when Moore filed his first petition. The finding that *Gardner* creates the sort of accuracy-enhancing rule that warrants retroactive application to Moore's sentencing in 1974 is in no way inconsistent with the concurrent finding that Moore's failure to raise the claim in his first federal habeas petition might be excusable to further the ends of justice.

**8.** I assume that *Proffitt* represents new law for retroactivity purposes. The Court in *Proffitt* noted that a capital defendant had no right to cross-examine witnesses whose statements were considered by the court in sentencing.

*Williams v. New York,* 337 U.S. 241, 250, 69 S.Ct. 1079, 1084, 93 L.Ed. 1337 (1949). Nevertheless, this Court created a new rule, in light of *Furman* and its progeny, which granted a defendant the right to cross-examine psychiatric witnesses whose testimony is contained in sentencing reports. In fact, this Court has yet to go as far as Moore requests in expanding a defendant's right to cross-examine adverse witnesses during sentencing. This Court's original broad opinion in *Proffitt* was modified to establish only the right to examine psychiatric witnesses. *See* 706 F.2d at 312.

**9.** Because *Teague* only addresses retroactive application of *new* law, *see* 109 S.Ct. at 1070, Moore argues that *Teague* does not bar consideration of the merits of his *Smith* claim by reason of non-retroactivity.

355, 83 L.Ed.2d 291 (1984), in support of Moore's proposition. However, *Alvord* only held that the finding in *Battie* that *Smith* was not new law for retroactivity purposes did not necessarily mean that counsel was ineffective for not anticipating its holding in failing to raise a point on appeal. Because the standard for excusing the failure to foresee a new decision is different in the ineffective assistance context, *Alvord* does not necessarily stand for the proposition that a petitioner would similarly be excused in the abuse of the writ context. *Alvord* is weak precedent for Moore's claim that this Court should readopt its holding that *Smith* can simultaneously be old law and new law. The Supreme Court's remand of this case in light of *Teague* may suggest that only decisions which are new law for retroactivity purposes may excuse a successive petition. If so, then Moore's *Smith* claim would have to be dismissed. The remand should have forced this Court to take a hard look at the relationship between its definitions of "new law."

## III. ABUSE OF THE WRIT

Although I think it ill-advised to revisit our 1987 decision absent a change in the law or facts, *cf. Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1197 n. 42 (5th Cir.1978), *cert. denied*, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979) (counseling against redeciding questions "absent the most cogent reasons such as the avoidance of manifest injustice"), I feel compelled to address the merits of the plurality's decision to ignore *Teague* and affirm the district court's decision to dismiss all of Moore's claims under Rule 9(b). The majority's position[10] that Moore has abused the writ is untenable.

### A. Proffitt

This Court decided *Proffitt, supra*, five months after the district court decided Moore's first federal habeas petition. Un-

der Rule 9(b), the district court must consider the merits of Moore's *Proffitt* claim if *Proffitt* constitutes "[a] retroactive change in the law." *See* Advisory Committee Note Rule 9(b); *see also Sanders v. United States*, 373 U.S. 1, 17, 83 S.Ct. 1068, 1078, 10 L.Ed.2d 148 (1963) ("the applicant may be entitled to a new hearing upon showing an intervening change in the law"). As discussed in Part II(C)(2) above, *Proffitt* clearly worked a change in the law which must be applied retroactively under *Teague*. Before *Proffitt*, a capital defendant had no cross-examination right at the sentencing phase of his trial. *See Williams*, 337 U.S. at 250, 69 S.Ct. at 1084; *see also Moore*, 824 F.2d at 854 (complete discussion of why *Proffitt* constitutes new law for purposes of abuse of the writ). Because *Proffitt* was an unanticipated change in the law which should be applied retroactively, Moore's successive claim should be excused from dismissal.

### B. *Estelle v. Smith*

As discussed above in Part II(C)(3), the Supreme Court's remand in light of *Teague*, a retroactivity case, seems aimed at this Court's tenuous distinguishing of *Battie v. Estelle*, 655 F.2d 692 (5th Cir.1981). *See Moore*, 824 F.2d at 853 and n. 12. Our response to the mandate might be to hold that the definition of new law for retroactivity and abuse of the writ are the same. Such a holding would leave us no choice but to hold that Moore's *Estelle v. Smith* claim constitutes an abuse of the writ. This crucial intersection of retroactivity and abuse of the writ jurisprudence is what the plurality should be addressing today. It is a question of great importance, the answer to which might finally provide some definition to our vague notions of what constitutes "new law" in various contexts.

### C. Gardner

This Court's 1987 opinion remanded Moore's claim brought under *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), for consideration of whether the ends of justice might excuse

---

**10.** Again, I note that while only the plurality opinion flagrantly disregards the Supreme Court's mandate in reaching and redeciding the abuse of the writ issues, the concurring judges accede in, and effectively join, the plurality's repudiation of this Court's 1987 opinion with regard to abuse of the writ. *See* concurring opinion of Roney, C.J., at 1517.

Moore's failure to raise the claim in his first petition. Moore's claim is based on the state's alleged failure to provide him a meaningful opportunity to review, correct, or supplement evidence presented against him at sentencing. This Court found the district court's ends of justice analysis unsatisfying and remanded for "fresh consideration," noting that the district court had not had the benefit of *Smith v. Murray*, 477 U.S. 527, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986). I cannot join in the plurality's finding that Moore's claim is "meritless," at 1513; *see Sanders*, 373 U.S. at 15, 83 S.Ct. at 1077, and therefore subject to dismissal.

It is undisputed that the state, *at the earliest*, provided Moore with the key evidence used to sentence him to death on the day of sentencing. It also appears clear from the record that some of this evidence was false. Without a hearing having been conducted before the district court, I cannot begin to evaluate the merits of Moore's claim. *See Demps v. Dugger*, 874 F.2d 1385, 1393-94 (11th Cir.1989) (Johnson, J., concurring in part and dissenting in part). However, I cannot conceive that the receipt of evidence on the day of sentencing can provide the meaningful opportunity for review demanded by *Gardner*. *See Gardner*, 430 U.S. at 362, 97 S.Ct. at 1207.

The Supreme Court has suggested that a successive petition may only be excused in the interest of justice if the petitioner makes a colorable showing of actual innocence. *See Kuhlmann v. Wilson*, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986) (plurality). The Court has not yet defined when a capital defendant is colorably "innocent" of his death sentence. *See Dugger v. Adams*, —— U.S. ——, 109 S.Ct. 1211, 1217 n. 6, 103 L.Ed.2d 435 (1989). It has indicated that the alleged sentencing error must have "precluded the development of true facts [or] resulted in the admission of false ones." *Smith v. Murray*, 477 U.S. at 538, 106 S.Ct. at 2668 (citing *Murray v. Carrier*, 477 U.S. 478, 496, 106 S.Ct. 2639,

2650, 91 L.Ed.2d 397 (1986)). Since Moore's claim, if true, goes to the very integrity of the trial court's fact-finding, his second petition may be excusable in the interests of justice.[11] I can imagine no more compelling excuse than that presented by a petitioner allegedly sentenced to death on the basis of false information.

## IV. CONCLUSION

I can neither understand nor accept what this Court does in this case. By repudiating its 1987 opinion concerning abuse of the writ and ignoring the Supreme Court's mandate, this Court provides ammunition to those who claim that the shifting composition of a court is more important than the rule of law in settling disputes. By deciding this case on grounds neither argued nor briefed on rehearing, this Court prevents the litigants from explaining positions taken more than five years ago. Most unconscionably of all, by foreclosing examination of the merits of petitioner's claims, this Court leaves standing unchallenged a death sentence almost certainly rendered on the basis of false information.

"I feel constrained by a sense of duty"[12] to dissent from the decision this day rendered.

ANDERSON, Circuit Judge, dissenting:

There is case law indicating that a vacated decision has no precedential value. However, I suggest that the purposes and values underlying the doctrine of *stare decisis* are implicated in the instant context— i.e., where an in banc decision of a court of appeals is vacated by the Supreme Court "for reconsideration in light of" a case which is entirely unrelated to the issue as to which precedential value is implicated. Thus, I respectfully dissent from the majority's refusal to take into consideration *stare decisis* values. In other words, while I acknowledge that our previous in banc decision on the abuse of the writ issue is

---

**11.** It is worth noting that Moore attempted to bring the *Gardner* claim in his first petition by *pro se* amendment. His second habeas counsel also tried unsuccessfully to amend the first petition to include the *Gardner* claim.

**12.** *See Twining v. New Jersey*, 211 U.S. 78, 114, 29 S.Ct. 14, 26, 53 L.Ed. 97 (1908) (Harlan, J., dissenting).

not binding, I nevertheless submit that *stare decisis* values should have been taken into account in our present decision. For this reason, I agree with much of what is said in Part I of Judge Kravitch's opinion and Part I of Judge Johnson's opinion.

I join in all of Part II (Applying *Teague* to Moore's Petition) of Judge Kravitch's opinion, except footnote 5. I join in full Part III (Abuse of the Writ) of Judge Kravitch's opinion.

With respect to Judge Johnson's opinion, I join Part II.A. (Waiver); Part II.B. (Retroactivity of *Teague*); Part II.C.1. (*Gardner*); Part II.C.2. (*Proffitt*); Part III.A. (*Proffitt*); and Part III.C. (*Gardner*).

CLARK, Circuit Judge, joins in Judge KRAVITCH's dissent and in Judge JOHNSON's dissent except as to Part II.A. (Waiver), Part II.C.3 (*Smith*) and Part III.B (*Estelle v. Smith*).